# CITY OF ST. LOUIS v. ABRAHAM SLUPSKY, Appellant.

Division One, January 3, 1914.

1. MUNICIPAL CORPORATIONS: Charter: General Welfare Clause: Disturbing the Peace: Disturber's Own Premises. The City of St. Louis has the power, under its charter (Art. 3, sec. 26, cl. 14), to pass "all such ordinances . . . as may be expedient in maintaining the peace, good government, health and welfare of the city," and it is therefore empowered to inflict a penalty for disturbing the peace by offensive conduct and vile language, even though the disturber stood meanwhile in his own back yard.

St. Louis v. Slupsky.

2. ———: ———: ———: ———: ———: Limitations on Owner's Use of His Property. The right of every person to use his own property is subordinate to the right of society that he shall so use it as not to violate any of those rules of decency and health upon which the peace and comfort of those in the vicinity largely depend.

3. NUISANCE: Vile Language. The filth that comes from the tongue, and addresses itself to the ear, is as revolting to normal people as the sensations that assail the other senses from nuisances against which the law protects them.

4. BREACH OF PEACE: Words. "Breach of the peace" is a generic term that includes all violations of public peace or order, and acts tending to a disturbance thereof. It may consist of such acts as tend to excite violent resentment; but unless it tends to excite immediate violence, abusive and insulting language will not constitute a breach of the peace unless so provided by statute.

5. MUNICIPAL ORDINANCE: Words Calculated to Provoke Breach of the Peace: Instructions. In a prosecution under an ordinance of the city of St. Louis which authorizes the infliction of a penalty upon any person who "shall disturb the peace of others by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene or offensive language, calculated to provoke a breach of the peace," it was error for the court to instruct that if the jury believed that the defendant used indecent, unseemly, profane, obscene and offensive language in the presence of neighbors, and if their peace or the peace of either of them was disturbed thereby, they should find him guilty. Such instruction ignored the requirement of the ordinance that the language—or some of it, at least—must have been "calculated to provoke a breach of the peace."

Appeal from St. Louis Court of Criminal Correction. —*Hon. Benjamin J. Klene*, Judge.

REVERSED AND REMANDED.

*Chester H. Krum* for appellant.

(1) (a) The city cannot take cognizance of occurrences on private premises. There must be something of a public nature in the place itself. (b) The charter authorizes the city to restrain and prevent any riot, rout, noise, disturbances, or disorderly assem-

blage and amusements dangerous to persons or property. Charter, St. Louis, art. 3, sec. 26. There is no suggestion in the ordinance that the noise or language reprehensible under its provisions must be dangerous to persons or property. (c) The report is so indefinite that a conviction under it might not operate as a bar to another action. St. Louis v. Babcock, 156 Mo. 153. (2) Upon the whole case, the appellant should have been discharged. Although the proceeding is only *quasi,* yet it is the law that the ordinance must be strictly construed, the proof must be beyond a reasonable doubt—the quantum must be as nearly as possible that of a criminal charge, without coming quite up to the full measure. So to make faces and howl at one's neighbor across a practically unscalable fence—all done on private premises—is not within the province of St. Louis to consider, because the charter does not so provide. *Sic est lex non scripta.* And then even if the city can mulct under given circumstances, even the doctrine *quasi* requires some semblance of particularity and notice in the pleading which in the language of the immortal Benton starts the ball in motion.

*William E. Baird* and *Everett Paul Griffin* for respondent.

(1) The city of St. Louis had ample authority to pass the ordinance against disturbance of the peace, under its police power, as well as under the specific power conferred by section nine of the charter. Charter, sec. 26, pars. 9, 14; Gunning Co. v. City, 235 Mo. 99; St. Louis v. Galt, 179 Mo. 8; St. Louis v. McCann, 157 Mo. 301; Glasgow v. Bazan, 96 Mo. App. 412. (2) Appellant, because he was on his own property, had no special privilege to use the language or to commit the acts as charged in the complaint. The use of private property itself, is subordinate to the public welfare. Gunning Co. v. City,

235 Mo. 99; St. Louis v. Galt, 179 Mo. 8; St. Louis v. McCann, 157 Mo. 301; State v. Brumley, 53 Mo. App. 126; State v. Webb, 163 Mo. App. 275.

BROWN, C.—This proceeding was begun in the first district police court of the city of St. Louis, upon the following report of the chief of police:

"To the Police Justice of the First District Police Court of the City of St. Louis, Missouri, June 29, 1909.

State of Missouri, } ss.
City of St. Louis.   }

"City of St. Louis, June 28, A. D. 1909.
"Abraham Slupsky,
             "To the City of St. Louis, Dr.
    "To five hundred dollars for the violation of an ordinance of said city entitled An Ordinance in Revision of the General Ordinance of the City of St. Louis, being ordinance No. 22903, section 1537, approved March 19, 1907.

    "In this, to-wit:  In the City of St. Louis and State of Missouri, on or about the 28th day of June, 1909, the said Abraham Slupsky did then and there wilfully disturb the peace of others, and particularly of Lawrence L. and Marius D. Prince, by violent, tumultuous, offensive and obstreperous conduct and carriage, and by loud and unusual noises, and by unseemingly profane, obscene and offensive language, calculated to provoke a breach of the peace, and by assaulting, striking and fighting others, and particularly Lawrence L. and Marius D. Prince, contrary to the peace and dignity of the city and the ordinance in such cases made and provided.
Contrary to the ordinance in
such cases made and provided.
                    "E. P. CREECY,
        "Chief of Police of the City of St. Louis."

The ordinance is as follows:

"*Sec.* 1537.—*Disturbances of the peace, assault, etc.—Penalty.*—Any person who, in this city, shall disturb the peace of others by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene or offensive language, calculated to provoke a breach of the peace, or by assaulting, striking or fighting another; or any person who, in this city, shall permit any such conduct in or upon any house or premises owned or possessed by them (him), or under (his) their management or control, so that others in the vicinity are disturbed thereby, shall be deemed guilty of a misdemeanor, and upon conviction thereof be fined not less than five nor more than five hundred dollars."

Appellant took a change of venue from the first district police court to the police court south of Arsenal street, where he was tried and judgment rendered in his favor, from which the city took its appeal to the court of criminal correction, where it came to trial.

The evidence, which is undisputed, was to the effect that Mr. Slupsky lived on the south side of the Lindell boulevard in the city of St. Louis. His backyard was from one hundred to one hundred and twenty-five feet in depth and was divided from the backyard of the Prince family, who lived in the adjoining premises on the west, by a wire fence that was high enough to come up to Mr. Slupsky's chest, and a hedge about half as high as the fence, along which it grew. On the date charged in the report or information, some of the younger members of the Prince family, including three boys, the youngest being seventeen years old, and their sisters who were young ladies of various ages that come within that description, were at luncheon in the dining room in the rear end of their house, when one of them, Benton, the youngest of the

brothers, went out into the yard, where he heard a turmoil in the Slupsky residence, and soon Mr. Slupsky came down his back steps apparently driving his children before him, and talking· to the Prince boy in a loud tone and with much profanity and vile language, and threatening not only him, but the Princes generally. He came up to the fence where he stood for a while continuing the same kind of conversation, shaking his fists and swaying his body, while a few people gathered in the alley looked over the fence and listened. Mrs. Noonan, whose house fronted on Pine street, the next thoroughfare south of the Lindell boulevard, and whose backyard abutted on the alley which divided it from the Slupsky backyard, was in the house with her daughter and a child, heard it and went out and listened, and remarked that she would not stand for such language. Mr. Desloges, a lawyer, whose residence was also on West Pine street across the alley from that of Mr. Prince, was sitting in his library and heard the noise, and he went out and listened to the conversation from his kitchen window. His cook and laundress were also interested and were at the alley gate. While things were in this condition Mr. Rainey, a policeman, who was walking down the alley about half a block away, heard the conversation, and a colored man called him and told him there was a fight down there in that yard, and he went down the alley to Mr. Prince's back gate where he heard Mr. Slupsky talking very loudly. When the latter saw the policeman he went into the house. At the request of one of the Princes, Mr. Rainey followed him and placed him under arrest. The subject and character of the conversation were incidentally disclosed and illustrated in the testimony of Mr. Prince's butler, an eyewitness from his bathroom window. Referring to Mr. Slupsky he said: "Then he went in and got his butler and brought him out and told him if the chickens came

in to sick the dog on them and let him kill every damned one of them and the son-of-a-bitch that would lay a hand on his dog he would cut the bastard's heart out. Mr. Benton came around in the yard and he says to Mr. Benton, 'Did you hear what I say?' He said he didn't know whether he did or not. He says, 'If the son-of-a-bitch lays a hand on my dog, I will cut the bastard's heart out.' Mr. Marius walked out and he began to shake his fist in Mr. Marius's face. Mr. Marius says, 'Don't cuss me,' and he went on talking. Then as he walked away, he says, 'Society stiff, raising chickens in this neighborhood!' ''

When evidence was offered the defendant objected to its admission on the ground that the report did not state facts sufficient to constitute a cause of action, and at the close of the testimony asked the court to instruct that upon the evidence adduced the jury would find for the defendant. The court overruled the objection to the introduction of testimony and refused the instruction asked, to each of which rulings the defendant at the time duly excepted. The court thereupon instructed the jury of its own motion as follows:

"If the jury believe from the evidence that the defendant, Abraham Slupsky, in the city of St. Louis and state of Missouri, on or about the 28th day of June, 1909, did wilfully, that is, intentionally, use indecent, unseemly, profane, obscene and offensive language in the rear of the premises, 3846 Lindell boulevard, or the premises next west, in the presence of Lawrence L. Prince and Marius D. Prince, and that the peace of them, or either of them, was thereby actually disturbed by said indecent, unseemly, profane, obscene and offensive language, used as aforesaid, you will find the defendant guilty as charged in the report of the chief of police, filed herein, and unless you so find you should acquit the defendant."

St. Louis v. Slupsky.

I.   It is strenuously urged by the defendant that it is not within the power of the city to prevent one from using whatever language he chooses upon his own premises.   He seems to be under the impression that the ordinance upon which this complaint was framed depends for its validity upon the ninth clause of section 26, article 3, of the charter of the city, which empowers the Municipal Assembly "to restrain and prevent any riot, rout, noise, disturbance, or disorderly assemblage, and amusements, dangerous to persons or property, in any street, house or place in the city."   In this he is in error.   Its authority is evidently derived from the fourteenth or general welfare clause of the same section, which authorizes it to pass "all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city,   .   .   .   and to enforce the same by fines and penalties, not exceeding five hundred dollars."   Municipal corporations of this character are formed to meet the needs of denser populations, where propinquity renders the people dependent to a great extent upon the conduct of each other for the existence of those conditions of decency, cleanliness and morality necessary to peace, comfort and health in civilized communities.   The filth that comes from the tongue, and addresses itself to the ear, is as revolting to normal people as the sensations that assail the other senses from nuisances against which the law protects them.

*Breach of the Peace: Disturber on Own Premises: City Ordinance.*

*Nuisance: Words.*

The right of every person to use his own property, is subordinate to the right of society that he should so use it as not to violate any of those rules of decency and health upon which the peace and comfort of those in their vicinity largely depend.   The vile, profane and noisy tirade of Mr.

*Sic Utere Tuo, etc.*

Slupsky was of this character and was as offensive discharged from one side of the wire fence as from the other. That the general welfare clause of the charter gives the Municipal Assembly the right to protect the people of the city against inflictions of that character is evident, and we therefore hold the ordinance in question to be within its powers, and applicable as well to such acts done on the premises of the defendant in cases of this character as to those done upon the premises of another, or in a public place.

II. Greater difficulty is presented by the terms of the instruction upon which the case was submitted by the trial judge, of his own motion, to the jury. The ordinance upon which this prosecution is founded pronounces its penalty against any person who "shall disturb the peace of others by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene or offensive language, calculated to provoke a breach of the peace." The court instructed that if the defendant used indecent, unseemly, profane, obscene and offensive language in the presence of the Princes, and if their peace or the peace of either of them was actually disturbed thereby, they should find him guilty; thus ignoring the requirement of the ordinance that the language—or some of it, at least—must have been "calculated to provoke a breach of the peace," and substituting the requirement of its own that the peace of some one must have been actually disturbed thereby. It is difficult to catch the idea that lies hidden under the use by the Municipal Assembly of the words quoted. The use of the word "provoke" would seem to indicate that they refer to a physical encounter, or at least retaliation in kind, but it is not to be lightly imputed that the use of obscene language in the presence of women and children powerless to resent such an indignity by physical punishment would be lawful, while

it is made unlawful only when directed against fighting men. But "breach of the peace" is a generic term,

**Breach of the Peace.** and includes all violations of public peace or order, and acts tending to a disturbance thereof. [5 Cyc. 1024 and cases cited.] This court has characterized in the same terms the calling of one woman by another "a drunken slut," and threatening, if she did not leave, to throw a bucket of water on her. [State v. Lunn, 49 Mo. 90.] It may consist of such acts as tend to excite violent resentment. But unless it tends to excite immediate violence, abusive and insulting language will not constitute a breach of the peace unless so provided by statute. [5 Cyc. 1025 and cases cited.] This finds an extreme illustration in State v. Schlottman, 52 Mo. 164, where the language used was said to be "very immoral and reprehensible." This omision has been supplied by our Legislature, and this instruction would have been all right had the prosecution been by the State under section 3784, Revised Statutes 1899, as amended by Laws 1903, p. 164; but the city of St. Louis seems to have been more lenient with this class of offenses, and has seen fit, so far as they affect its own peace as a municipality, to retain the common law qualification to which we have already adverted. It is true that we have no doubt the language attributed to Mr. Slupsky would have filled all the requirements of the ordinance, but it is not within our province to constitute ourselves a jury in a case of this character, and, in the absence of a plea to that effect, find him guilty of an offense other than that upon which the verdict was found.

The judgment of the court of criminal correction is reversed, and the cause remanded. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion by *Brown, C.,* is adopted as the opinion of the court. All the judges concur.