CITY OF ST. LOUIS, Respondent,

v.

Lorena Jeanne TINKER, Appellant.

No. 59088.

Supreme Court of Missouri,
En Banc.

Nov. 8, 1976.

Dianne Taylor and Toby Hollander, Taylor, Eichner, Hollander & Platke, St. Louis, for appellant.

Judith Anne Ronzio, Asst. City Counselor, St. Louis, for respondent.

BARDGETT, Judge.

The defendant-appellant Lorena Jeanne Tinker was charged in St. Louis City Court with peace disturbance under section 762.-030, Rev.Code of St. Louis 1960, and resisting arrest. She was acquitted of the resisting arrest charge and convicted of peace disturbance. Appellant appealed the conviction to the St. Louis Court of Criminal Corrections and, on a trial de novo without a jury, was convicted of peace disturbance and sentenced to fifteen days in the city workhouse. Execution of sentence was suspended and appellant was placed on probation for two years.

After appellant's motion for new trial was overruled, she filed her notice of appeal to this court. The principal issue on appeal is the constitutionality of the peace disturbance ordinance of St. Louis as appellant contends it is violative of the Fifth and Fourteenth Amendments of the United States Constitution. The resolution of this appeal requires a construction of certain provisions of the United States Constitution; therefore, this court has jurisdiction pursuant to Art. V, sec. 3, Mo.Const., as amended 1970.

There is some dispute as to the facts but there is general agreement as to the overall situation which gave rise to the arrest of appellant. On July 12, 1973, a group of people gathered at St. Louis city hall to protest the alleged lax enforcement of the city's lead paint ordinance. A number of the protestors decided to remain in the rotunda of city hall through the night to continue their protest. The mayor permitted this to be done. Mrs. Tinker had been one of the protestors who arrived about 2:30 p. m. She testified she left city hall about 4:30 p. m. to go get sleeping bags and sweaters for the protestors to use during the night and returned about 7:30 p. m. whereupon she sought entrance at the east door of city hall. She knocked on the door and it was opened by one of the security guards.

The city's evidence consisted of the testimony of three police officers. Officer Miller stated that he was on duty at city hall that evening and about 7:30 p. m., his attention was drawn to the east door where he observed Mrs. Tinker yelling at a security guard. Although he could hear Mrs. Tinker from his position approximately 30 feet away, he could not understand what she was saying. After walking the distance to the door, he told Mrs. Tinker that no one was permitted to enter the building although anyone inside was free to leave. Mrs. Tinker screamed that she was coming inside and no one was going to keep her out. Officer Miller said the screaming attracted the attention of the approximately 35 protestors in the rotunda who then began congregating in the area of the door. She said she had some bedding for the protestors and was coming into the building. She called the police "pigs", "stupid", and "cops". Officer Crook and Lt. Beech were also present and came over to the eastdoor area. There were other people on 12th street (the east side of city hall) and they began coming up the steps of the building. Miller didn't know if they were demonstrators or just passersby. After the

screaming went on for a minute or so, Miller told her she was under arrest for peace disturbance, to which she responded she was not going to jail. In addition to screaming, she waved her arms and attempted to kick the officer. Officer Crook and Lt. Beech assisted Miller in handcuffing her hands behind her back. As Mrs. Tinker was being arrested, some of the demonstrators said, "You are not going to arrest Mrs. Tinker." The police took Mrs. Tinker out to a parking lot and then drove her to the fourth district station. In describing the volume of appellant's noise, the officer said it was loud enough to attract 10 or 12 people on 12th street and those inside city hall to come to the door.

Officer Crook testified there were about 50 to 75 people demonstrating against lead paint and of these about 40–50 were inside city hall. He saw some people inside going toward the door and heard a commotion. He went to the door and saw Mrs. Tinker arguing with his partner claiming she had a right to come into the building to take clothing and bedding to the other protestors. He could hear this arguing from about 10 to 15 feet away. The only thing he could recall Mrs. Tinker screaming was, "I am going to take this bedding to these people inside city hall. Nobody can stop me, not even you stupid pigs." Lt. Beech ordered her arrest for causing a disturbance and "riotous situation". As Mrs. Tinker was being arrested she called out, "Help me." According to the officer about 15 to 20 people outside and 30 to 35 people inside moved toward the door, but he did not hear them say anything. Apparently in response to a directive by another officer, these people came no closer than 25 to 30 feet.

Lt. Beech testified he was stationed inside city hall. The demonstrators were allowed to spend the night in the rotunda but if they left they could not return that night. He heard loud talking near the east door and went over there. He told appellant that no one was permitted to enter the building. She tried to push and shove her way into city hall. She did not curse but did call the police "pigs" and said they were

the cause of a lot of death and destruction in the world. He told her she would be arrested if she did not leave the place and then ordered her arrest because she would not leave. The yelling went on and she tried to kick the officers when they were handcuffing her. About 15–20 people inside and the same number outside came to the door of the building. After the arrest took place, the other protestors just went back and sat down. The lieutenant testified appellant said nothing vulgar but her calling police "pigs" and saying they were responsible for many peoples' death was offensive to him and uncomplimentary.

Ordinance No. 762.030 of the city of St. Louis provides:

"762.030. Public disturbance of the peace.—No person shall disturb the peace of others by noisy, riotous or disorderly conduct, nor by violent, tumultuous, offensive or obstreperous conduct or carriage, nor by loud or unusual noises, nor by unseemly, profane, obscene, indecent, lewd or offensive language, calculated to provoke a breach of the peace, nor by assaulting, striking or fighting any other person in any park, street, alley, highway, thoroughfare, public place or public resort. (1948, C.46, s.20.)"

The information charging appellant with violating the above-noted ordinance is as follows:

"On information, the undersigned City Counselor within and for St. Louis, Missouri, complains and informs the Court that on or about the 12th day of June, 1973, within the corporate limits of St. Louis, Missouri, at or near 1200 Market above-named defendant did then and there unlawfully disturb the peace by noisy, riotous, and disorderly conduct, in a public place, and did then and there use indecent, lewd, and profane language in violation of Section 762.030 and 1.100; Revised Code of the City of St. Louis, Ordinance No. 50549, approved May 2, 1961. On information undersigned prosecutor, on his oath of office, informs the Court that the above facts are true as he verily believes."

Appellant contends in point I that ordinance 762.030 "is unconstitutionally vague on its face, and thereby violates the Fifth and Fourteenth Amendments to the United States Constitution" and in point II that the ordinance is "unconstitutionally overbroad, sweeping within its prohibitions activities which are constitutionally protected and therefore violates the Fifth and Fourteenth Amendments to the United States Constitution."

At the conclusion of the case the trial judge held that there was no evidence that appellant "did then and there use indecent, lewd, and profane language", struck that phrase from the information, and then found appellant guilty of peace disturbance under the ordinance. Appellant was therefore convicted of disturbing the peace by "noisy, riotous, and disorderly conduct, in a public place."

As noted supra, appellant's main contention is that the ordinance is, on its face, unconstitutionally vague and overbroad under the Fifth and Fourteenth Amendments of the United States Constitution. Numerous cases are cited in support of this contention.

Similar contentions have been considered by the Supreme Court of the United States with reference to various peace disturbance ordinances and laws. The problem arises principally when a person has been convicted of peace disturbance where the factual setting involved loud, insulting, obscene, offensive, or opprobrious language, rather than assaulting, striking, fighting, or physical contact with another person.

In this case the conduct which was the basis for the arrest and conviction of appellant consisted of the uttering of words, i. e., speech. The noun "conduct" includes within its meaning the act of speaking and is not restricted to physically interfering with another. There was no evidence that appellant physically abused anyone prior to the time the police undertook to arrest her for "peace disturbance". Whatever she did while the police were arresting her was, presumably, part of the resisting-arrest charge of which she was acquitted and occurred after being told she was under arrest for peace disturbance. This case therefore comes within that category of cases involving language only and not physical contact.

The appellant does not contend the words she is alleged to have spoken are protected speech under the First Amendment of the United States Constitution. Furthermore, there is no First Amendment claim being made at all. The question to be resolved as to facial unconstitutionality requires the court to determine whether the ordinance in question has been authoritatively construed so as to limit the application of the ordinance to readily definable conduct which is not constitutionally protected.

In 1913 this court construed the ordinance under consideration in *City of St. Louis v. Slupsky*, 254 Mo. 309, 162 S.W. 155, and reversed and remanded the conviction holding that where one is charged under this ordinance with breach of the peace by "violent, tumultuous, offensive and obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly, profane, obscene or offensive language" it is necessary such conduct be found to have been "calculated to provoke a breach of the peace". 162 S.W. at 157.

In *City of Kansas City v. Thorpe*, 499 S.W.2d 454 (Mo.1973), the court construed a Kansas City peace disturbance ordinance and, citing most of the cases relied upon by appellant in the instant case, clearly recognized that such an ordinance could be upheld only if it did not infringe upon constitutionally protected expression and was limited to punishment of acts or conduct inciting violence or intended to provoke others to violence. In *Thorpe* the court, referring to *Slupsky*, said at 458:

"This court in 1913, in a case arising under an ordinance of the City of St. Louis, which concluded with the phrase 'calculated to provoke a breach of the peace,' in defining the term breach of the peace held it to be 'a generic term, and includes all violations of public peace or order, and acts tending to a disturbance thereof. . . . It may consist of such acts as to tend to

excite violent resentment. *But unless they tend to excite immediate violence* (emphasis supplied), abusive and insulting language will not constitute a breach of the peace unless so provided by statute.' *City of St. Louis v. Slupsky,* 254 Mo. 309, 152 S.W. 155, 157 (1913).

"This is the only case we are able to find in which the term 'breach of the peace,' unlimited by the ordinance or statute using the term, was defined in Missouri. We find no cases of either this court or of a Court of Appeals holding to the contrary. Nor did we find any case where a conviction for breach of the peace was upheld when it involved expression of a constitutionally protected right. See *City of Louisiana v. Bottoms,* 300 S.W. 316 (Mo.App.1927). We note that our statute on disturbing the peace, sec. 562.240, RSMo 1969, V.A.M.S., which has been in effect in substantially the same form for more than one hundred years, has been limited to the prevention of violence. The annotations of the statute show that this statute, being penal in nature, has always been strictly construed; e. g., see *State v. Maggard,* 80 Mo.App. 286 (1899). Further, it has been since 1889 the law of Missouri that local ordinances on any subject must be in harmony with general law. *City of Glasgow v. Bazan,* 96 Mo.App. 412, 70 S.W. 257 (1902). It therefore appears and we hold that in Missouri it now is and always has been the law that 'breach of the peace,' unless otherwise defined in the ordinance or statute using the term, refers only to acts or conduct inciting violence or intended to provoke others to violence."

In *Thorpe* the defendant contended the ordinance was unconstitutional under the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, sec. 10, of the Missouri Constitution, because it was (a) vague and (b) overbroad. The issues in *Thorpe* and the instant case as to constitutionality are very similar. They pose the question: Is a "peace disturbance" ordinance which is limited in its application to expression which is not constitutionally protected and proscribes only conduct which is intended and

calculated by the actor to provoke others to violence or incites violence sufficiently specific so as to inform the citizenry of the conduct that is proscribed? Calculated is defined as that which is "likely to produce a certain effect". *Kansas City v. Graham,* 502 S.W.2d 411 (Mo.App.1973).

In *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the appellant contended a New Hampshire statute under which he was convicted was unconstitutional in that it did not sufficiently define the conduct it proscribed (vagueness) and therefore violated the due process clause of the United States Constitution, Amendment XIV. The New Hampshire statute provided (315 U.S. at 569, 62 S.Ct. at 768): *"No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name,* nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation." (Emphasis added.) The italicized portion was the part under attack. Chaplinsky was a member of Jehovah's Witnesses and was distributing literature of his sect on the streets of Rochester, New Hampshire. Some citizens complained that Chaplinsky was denouncing all religions as a racket and the city marshal told them that Chaplinsky was conducting himself lawfully. The marshal then warned Chaplinsky that the crowd was getting restless. Sometime later a disturbance occurred and the traffic officer on duty proceeded to take Chaplinsky to the police station without arresting or informing him he was to be arrested. On the way they encountered the marshal who had been told there was a riot under way and was going to the scene. The marshal repeated his earlier warning to Chaplinsky to which Chaplinsky replied, " 'You are a God damned racketeer' and 'a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists'." The complaint charged Chaplinsky with addressing the foregoing words to the complainant marshal alleging them to be "offensive, de-

risive and annoying words and names" in violation of the statute set forth supra. 315 U.S. at 569, 62 S.Ct. at 768.

*Chaplinsky* attacked the statute on First and Fourteenth Amendment grounds—freedom of speech, press, and worship—and not Fifth Amendment grounds, but the Supreme Court's opinion is instructive with respect to specifying the conduct proscribed.

The New Hampshire Supreme Court in earlier decisions had construed the law to restrict its application to words such as have " 'a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed' ". 315 U.S. at 573, 62 S.Ct. at 770. The United States Supreme Court quoted the New Hampshire court, in part, as follows: "The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitutes a breach of the peace by the speaker—including 'classical fighting words', words in current use less 'classical' but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats." 315 U.S. at 573, 62 S.Ct. at 770.

The Supreme Court of the United States then held: "We are unable to say that the limited scope of the statute as thus construed contravenes the Constitutional right of free expression. It is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace. Cf. *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213; *Thornhill v. Alabama,* 310 U.S. 88, 105, 60 S.Ct. 736, 745, 84 L.Ed. 1093. This conclusion necessarily disposes of appellant's contention that the statute is so vague and indefinite as to render a conviction thereunder a violation of due process. A statute punishing verbal acts, carefully drawn so as not unduly to impair liberty of expression, is not too vague for a criminal law. Cf. *Fox v. Washington,* 236 U.S. 273, 277, 35 S.Ct.

383, 384, 59 L.Ed. 573." 315 U.S. at 573–574, 62 S.Ct. at 770.

· The cases reflect that First Amendment free-speech claims and Fifth Amendment claims of vagueness and overbreadth tend to overlap. This is because the question of vagueness and overbreadth necessarily involves a claim that by reason of the vagueness and overbreadth protected free speech may be punished. This was recognized in *Gooding v. Wilson,* 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

In *Gooding* the United States Supreme Court had before it a Georgia statute which provided: " 'Any person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor.' " 405 U.S. at 519, 92 S.Ct. at 1104. Wilson was convicted in a Georgia court on two counts of using opprobrious words and abusive language. The Georgia Supreme Court affirmed the conviction holding that the statute was not violative of the First and Fourteenth Amendments as vague and overbroad. Wilson then sought federal habeas corpus relief on the ground that the statute was facially unconstitutional as vague and overbroad. The United States District Court held the statute to be unconstitutionally vague and broad. The Fifth Circuit Court of Appeals affirmed as did the United States Supreme Court. The facts of *Gooding* as stated at 405 U.S. 519–520, 92 S.Ct. 1104, n. 1, are:

"The defendant was one of a group of persons who, on August 18, 1966, picketed the building in which the 12th Corps Headquarters of the United States Army was located, carrying signs opposing the war in Viet Nam. When the inductees arrived at the building, these persons began to block the door so that the inductees could not enter. They were requested by police officers to move from the door, but refused to do so. The officers attempted to remove them from the door, and a scuffle ensued. There was ample evidence to show that the defendant committed assault and battery on the two police officers named in the

indictment. There was also sufficient evidence of the use of the opprobrious and abusive words charged, and the jury was authorized to find from the circumstances shown by the evidence that the words were spoken without sufficient provocation, and tended to cause a breach of the peace. [*Wilson v. State*] 223 Ga. 531, 535, 156 S.E.2d 446, 449–450.

"Count 3 of the indictment alleged that the accused 'did without provocation use to and of M. G. Redding and in his presence, the following abusive language and opprobrious words, tending to cause a breach of the peace: "White son of a bitch, I'll kill you." "You son of a bitch, I'll choke you to death." ' Count 4 alleged that the defendant 'did without provocation use to and of T. L. Raborn, and in his presence, the following abusive language and opprobrious words, tending to cause a breach of the peace: "You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." ' Id., at 534, 156 S.E.2d, at 449."

The U.S. Supreme Court's holding that the statute was unconstitutionally vague and overbroad was based upon that court's determination that the Georgia Supreme Court had not construed the statute so as to limit its application to "fighting" words as defined in *Chaplinsky, supra.* That definition is words " 'which by their very utterance . . . tend to incite an immediate breach of the peace.' " 405 U.S. at 525, 92 S.Ct. at 1107. Although *Gooding* relies upon *Chaplinsky* for the definition of so-called "fighting" words, it seems quite obvious that there is very little difference, if any, between the New Hampshire statute which was upheld in *Chaplinsky* and the Georgia statute that was struck down in *Gooding.* The only perceivable difference is that the U.S. Supreme Court found the New Hampshire Supreme Court had previously restricted the application of its statute to "fighting" words and the Georgia Supreme Court had not so restricted the application of its statute.

*Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), was remanded at 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972), by the U.S. Supreme Court to the Louisiana Supreme Court for reconsideration in light of *Gooding.* Upon remand, the Louisiana Supreme Court again affirmed the conviction of peace disturbance and Lewis again appealed to the U.S. Supreme Court which held the New Orleans peace disturbance ordinance unconstitutional as being susceptible of application to speech protected by the First and Fourteenth Amendments. Specifically, the U.S. Supreme Court held that the Louisiana Supreme Court had not narrowed the scope of the ordinance to "fighting words" as defined in *Chaplinsky.* The New Orleans ordinance provided: "It shall be unlawful and a breach of the peace for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." 415 U.S. at 132, 94 S.Ct. at 972.

The facts in *Lewis* are: "On January 3, 1970, appellant and her husband were in their pickup truck following a police patrol car that was taking their young son to a police station after his arrest. An Officer Berner in another patrol car intercepted and stopped the truck. Berner left his car and according to his testimony, asked the husband for his driver's license. Words were exchanged between Berner and appellant and Berner arrested appellant on a charge of violating section 49–7. The parties' respective versions of the words exchanged were in sharp contradiction. Berner testified that appellant left the truck and 'started yelling and screaming that I had her son or did something to her son and she wanted to know where he was. . . She said, "you god damn m. f. police—I am going to (Superintendent of Police) about this" ' App. 8. Appellant's husband testified that Berner's first words were ' "let me see your god damned license. I'll show you that you can't follow the police all over the streets." . . . After (appellant) got out and said "Officer I want to find out about my son." He said "you get in the car woman. Get your black ass in the god damned car or I will show you something." ' App. 27. Appellant denied that she had

used 'any profanity toward the officer.' App. 37. The Municipal Judge credited Berner's testimony and disbelieved appellant and her husband." 415 U.S. at 131, n. 1, 94 S.Ct. at 971.

■ In *Lewis* it appears the court seized on the ordinance's proscription against "opprobrious language" and said that "opprobrious" embraces words that do not by their very utterance inflict injury or tend to incite an immediate breach of the peace. The court noted in *Lewis* that it had reached the same conclusion as to the word "opprobrious" in *Gooding* and on that basis struck down the Georgia statute. But, again in *Lewis,* the court directed its attention to the failure of the Louisiana Supreme Court to refine or narrow the type of speech which could be punished under the ordinance to the constitutional definition of "fighting words" announced in *Chaplinsky.* In short, the Louisiana court simply held that traditionally obscene or opprobrious words *are* per se "fighting words" without regard to their likelihood in a particular factual setting to provoke or cause violence and upheld the ordinance on that basis. The U.S. Supreme Court, in effect, held that just because a court says an obscene word is a fighting word does not necessarily make it so in fact or law. As applied to the instant case, the substance of *Lewis* appears to be that, insofar as "breach of the peace" or "peace disturbance" laws or ordinances are concerned, it is essential to their constitutional validity that they operate so as to punish the speaker only when his verbal conduct (speech) is such that, in the given factual setting, it is reasonably likely to incite others to violence (breach of the peace).

■ The St. Louis ordinance proscribes verbal conduct (noisy, riotous or disorderly) which is calculated to provoke a breach of the peace. This provision has been construed since at least 1913, insofar as verbal conduct is concerned, to only proscribe verbal conduct which tends to excite immediate violence. Abusive and insulting language does not per se constitute a breach of the peace under this ordinance. *City of St.*

*Louis v. Slupsky, supra,* at p. 157. The construction placed upon this ordinance in *Slupsky* was reaffirmed in *City of Kansas City v. Thorpe, supra,* in 1973.

■ The conduct or language used by the speaker and its probable effect with respect to immediate violence must be viewed in the setting in which it occurs. The police officer who hears and sees the event take place must, of course, make some judgment as to whether the acts and conduct of the speaker, in the particular circumstances, is inciting violence or is intended to and reasonably probable that such acts and conduct will provoke others to violence. The obvious purpose of the ordinance is to prevent violence by imposing a sanction on conduct reasonably calculated to cause immediate violence. When the projected violence does not occur and the person responsible for the situation is arrested for peace disturbance and removed from the scene, one of the questions which arises during the trial for peace disturbance is the same as the question the officer has to resolve immediately at the scene, to wit: Is the actor's conduct intended to and reasonably probable to incite the other people present to immediate violence in the circumstances then and there prevailing?

■ This is what the St. Louis ordinance is limited to by its terms and by the decisions of this court. *St. Louis v. Slupsky, supra, Kansas City v. Thorpe, supra.* As such, it is neither vague nor overbroad, *Chaplinsky v. New Hampshire, supra,* and does not punish mere insults or opprobrious words per se as did the ordinance in *Lewis v. City of New Orleans, supra,* and the statute in *Gooding v. Wilson, supra.*

Ordinance No. 762.030, Rev.Code of the City of St. Louis 1960, is not facially unconstitutional as being vague or overbroad under the Fifth and Fourteenth Amendments of the United States Constitution.

■ Nevertheless, the conviction of appellant must be reversed. She was not charged with having said or done anything

**520**

"calculated to provoke a breach of the peace". It was merely charged that she did "disturb the peace by noisy, riotous and disorderly conduct in a public place . . . ." Nor is there any finding that her verbal conduct was "calculated to provoke a breach of the peace" nor any finding that her verbal conduct was intended to and was reasonably probable to incite others to violence. This is in accord with *Slupsky, supra,* where this court reversed and remanded the peace disturbance conviction because the court's instructions to the jury ignored the requirement that the conduct of the defendant be "calculated to provoke a breach of the peace." The instant case was court-tried and therefore instructions were not utilized. When the charge of peace disturbance is based upon *verbal* conduct, there is always the risk that free speech will be suppressed. The risk in this sensitive area is minimized when it can be reliably determined that the fact finder actually found the verbal conduct of the defendant was intended and calculated to provoke immediate violence. In *Kansas City v. Graham,* 502 S.W.2d 411 (Mo.App.1973), a conviction of peace disturbance was reversed for failure of the information to charge that the language allegedly used by the defendant was "calculated to provoke a breach of the peace" because that is essential to peace disturbance by verbal act in Missouri. *City of St. Louis v. Slupsky, supra, City of Kansas City v. Thorpe, supra.*

The judgment is reversed.

All of the Judges concur.