# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-2460

_____

Rodney Brown

*Plaintiff - Appellant*

v.

City of St. Louis, Missouri; John Does; Phil Harden; Donald Trump

*Defendant*s

Matthew T. Boettigheimer; Joseph Steiger; Steven Korte

*Defendants - Appellees*

------------------------------

American Civil Liberties Union of Missouri

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 14, 2022
Filed: July 27, 2022

_____

Before SHEPHERD, ERICKSON, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Rodney Brown was removed from a political rally and arrested for violating a St. Louis, Missouri ordinance that prohibits disturbing the peace. After Brown was acquitted of that charge in state court, he brought claims against, as pertinent to this appeal, three St. Louis Metropolitan Police Department (SLMPD) officers (Officers Matthew Boettigheimer and Steven Korte and Detective Joseph Steiger). The district court[1] granted summary judgment in favor of the officers, and Brown now appeals. Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

On March 11, 2016, then-presidential candidate Donald Trump held a campaign rally at the Peabody Opera House in St. Louis, a privately owned venue. The event was ticketed, though tickets were free. Brown obtained a ticket and selected a front-row seat near the center of the stage. Although the exact number of attendees is not found in the record, Officer Boettigheimer testified in his deposition that he believed that over 1,000 people were in attendance. Additionally, numerous SLMPD officers were assigned to work the event. A 25-page intra-department report shows that the SLMPD deployed a multitude of units on the day of the rally, with units assigned to Trump's motorcade, the inside and outside of the Peabody Opera House, and the area surrounding the Peabody Opera House. Other units included a bomb and arson unit, an intelligence unit, a "mass arrest booking" unit, a special operations response squad, and a reserve SWAT team that coordinated with the United States Secret Service to offer a tactical response if needed. Officer Boettigheimer testified in his deposition that prior to working the at-issue rally, he learned of other Trump rallies that had become violent.

A video from the event, introduced by the officers in support of their motion for summary judgment and labeled as "Exhibit A," captured a pause in Trump's

---

[1]The Honorable Matthew T. Schelp, United States District Judge for the Eastern District of Missouri.

speech, at which point the auditorium's silence was disrupted by Brown's loud laughter. In response to this laughter, Trump shielded his eyes and looked into the crowd, apparently to determine where the laughter originated. Rallygoers began to stand up and can be heard in the video demanding that Brown be removed. Trump also demanded that Brown be removed, saying variations of "Get him out of here!"

The parties dispute what happened next. Brown maintains that other rallygoers "approached him . . . cursing and gesturing at him excitedly" and that he, "at no point[,] showed any indication of violence and was merely expressing his political opposition to Trump." On the other hand, Officer Boettigheimer testified in his deposition that, after laughing loudly, Brown began creating a "larger disturbance" and was yelling and pointing at other rallygoers. Officer Boettigheimer explained that, even as he and Officer Korte were escorting Brown out of the auditorium, Brown was turning around and yelling at the other rallygoers. When asked in his deposition why he decided to first approach Brown, Officer Boettigheimer testified that he had been standing approximately 100 feet from Brown when Brown laughed loudly. He explained that if Brown had *only* laughed, he likely would not have approached and arrested Brown. However, after laughing loudly, Brown "continu[ed] to cause a disturbance," and Officer Boettigheimer felt that the disturbance was growing too large and needed to be "quell[ed] . . . immediately."

A review of Exhibit A reveals that, after Brown's loud laughter, while Brown was still at his seat and before Officers Boettigheimer and Korte began escorting him out of the auditorium, another rallygoer confronted him. Mark Comfort, the man who was seated next to Brown, later testified in his deposition that Brown and this other rallygoer were standing "nose-to-nose." Exhibit A then shows Officers Boettigheimer and Korte approach Brown and escort him out of the auditorium. In accordance with Officer Boettigheimer's version of events, Exhibit A depicts Brown resisting the officers while also yelling and gesturing wildly at the other rallygoers and Trump. Although the video concludes prior to Brown's arrest, the record shows that, once out of the auditorium, Officer Boettigheimer placed Brown under arrest.

Detective Steiger later prepared the incident report documenting Brown's arrest, as well as dozens of other arrests that took place at the rally. Detective Steiger was not present at the Peabody Opera House, and he did not participate in Brown's arrest.

On April 6, 2016, the City of St. Louis filed a formal charge against Brown for violating Section 15.46.030 of the Revised Code of the City of St. Louis, which prohibits disturbing the peace. Following a bench trial before the St. Louis City Municipal Court, Brown was acquitted of this charge. He thereafter filed this lawsuit in which he brought eight claims and named as defendants Officers Boettigheimer, Korte, and Phil Harden, as well as Detective Steiger, Trump, John Does 1-3, and the City of St. Louis.[2] After the district court granted the City of St. Louis's motion to dismiss and the parties stipulated to the dismissal of several claims, only five claims remained. Of those five claims, three were brought pursuant to 42 U.S.C. § 1983: a Fourth Amendment unlawful seizure claim against Officers Boettigheimer and Korte (Claim 1); a Fourth Amendment malicious prosecution claim against Officers Boettigheimer and Korte and Detective Steiger (Claim 2); and a First Amendment retaliation claim against Officers Boettigheimer and Korte (Claim 3). The other two claims were brought under Missouri law: a false arrest claim against Officers Boettigheimer and Korte (Claim 5); and a malicious prosecution claim against Officers Boettigheimer and Korte and Detective Steiger (Claim 6). In each of these claims, Brown sued the officers in their individual capacities. The officers moved for summary judgment, and the district court granted that motion, finding that the officers were entitled to qualified immunity. This appeal follows.

---

[2]The district court dismissed Trump from this lawsuit prior to the filing of Brown's second amended complaint. However, Brown nevertheless named Trump as a defendant and described his alleged wrongful conduct in the body of the second amended complaint. Relatedly, Brown named "John Does" as defendants in his complaint and first amended complaint but did not name them as defendants in his second amended complaint, omitting mention of them altogether. Like Trump, "John Does" are still listed as defendants.

II.

We review an appeal from a grant of summary judgment based on qualified immunity de novo. Irvin v. Richardson, 20 F.4th 1199, 1204 (8th Cir. 2021). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [meaning that] there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (citation omitted). Generally, we view the facts in the light most favorable to the nonmoving party and "mak[e] all reasonable inferences in its favor." Walz v. Randall, 2 F.4th 1091, 1099 (8th Cir. 2021). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Steed v. Mo. State Highway Patrol, 2 F.4th 767, 770 (8th Cir. 2021) (quoting Scott, 550 U.S. at 380 (alteration in original)); see also Watson v. Boyd, 2 F.4th 1106, 1110 (8th Cir. 2021) ("When reviewing a law enforcement officer's entitlement to qualified immunity at summary judgment, a district court 'must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so "blatantly contradicted by the record . . . that no reasonable jury could believe [them].""" (alterations in original) (citation omitted)). Rather, instead of blindly accepting the nonmoving party's version of the facts, we may rely on video evidence found in the record where that video evidence "blatantly contradict[s]" the nonmoving party's characterization of the facts. See Steed, 2 F.4th at 770 (declining to adopt plaintiff's version of facts and instead looking to version of facts shown in video footage where two versions were inconsistent); White v. Jackson, 865 F.3d 1064, 1077 (8th Cir. 2017) (same); Ehlers v. City of Rapid City, 846 F.3d 1002, 1010 (8th Cir. 2017) (same).

Here, the district court granted qualified immunity to Officers Boettigheimer and Korte and Detective Steiger on all claims brought against them by Brown. "Police officers are 'entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional

or statutory right; and (2) the right was clearly established at the time of the deprivation.'" Bell v. Neukirch, 979 F.3d 594, 602 (8th Cir. 2020) (citation omitted). "'Clearly established' means that, at the time of the officer's conduct, the law was '"sufficiently clear" that every "reasonable official would understand that what he is doing"' is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (citation omitted). Stated differently, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. at 590. This requires either case law that "place[s] the lawfulness of the particular arrest 'beyond debate,'" or, in "the rare 'obvious case,'" unlawfulness that is "sufficiently clear even though existing precedent does not address similar circumstances." Id. (citations omitted). Further, we may conduct this inquiry in any order and resolve this inquiry on either prong, regardless of the order chosen by the district court. See Blazek v. City of Iowa City, 761 F.3d 920, 923 (8th Cir. 2014) ("We review a district court's qualified immunity determination *de novo* and may resolve the appeal under either prong of the analysis."); see also Pearson v. Callahan, 555 U.S. 223, 242 (2009) ("[T]he judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case."). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek, 761 F.3d at 922 (quoting Stanton v. Sims, 571 U.S. 3, 6 (2013) (per curiam)).

"In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Bell, 979 F.3d at 603 (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)); see also Joseph v. Allen, 712 F.3d 1222, 1228 (8th Cir. 2013) (explaining that summary judgment is appropriate on malicious prosecution claim where probable cause existed to arrest and initiate criminal prosecution against plaintiff); Just v. City of St. Louis, 7 F.4th 761, 768-69 (8th Cir. 2021) ("Like a Fourth Amendment claim for a wrongful arrest, a First Amendment retaliatory arrest claim is defeated by a showing of probable

cause . . . ."); Kurtz v. City of Shrewsbury, 245 F.3d 753, 757-58 (8th Cir. 2001) (explaining that officers who had probable cause to arrest and prosecute plaintiff cannot be held liable for state law torts of false arrest and malicious prosecution).

Probable cause exists "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" Nader v. City of Papillion, 917 F.3d 1055, 1058 (8th Cir. 2019) (citation omitted). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.'" Wesby, 138 S. Ct. at 586 (citation omitted). "The existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*.'" Bell, 979 F.3d at 603 (emphasis added) (quoting Devenpeck, 543 U.S. at 152).

We have previously explained that this probable cause standard "is a 'practical, nontechnical conception' that calls for 'facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" Id. (quoting Gerstein v. Pugh, 420 U.S. 103, 111-12 (1975)); see also Just, 7 F.4th at 767 ("'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt' under state law." (citation omitted)). There is "no place" in this analysis for "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence," Bell, 979 F.3d at 603 (quoting Florida v. Harris, 568 U.S. 237, 243-44 (2013)), but rather, this is an objective standard requiring that "[w]e afford officers 'substantial latitude in interpreting and drawing inferences from factual circumstances,'" Just, 7 F.4th at 767 (citation omitted). Alternatively, "where the officers act on a mistaken belief that probable cause exists, if that mistake is 'objectively reasonable,' *arguable* probable cause exists." Id. (emphasis added); see also Anderson v. Creighton, 483 U.S. 635, 641 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we

-7-

have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.").

Although this Court's opinions do not always expressly state as much, the terms "probable cause" and "arguable probable cause" are not interchangeable, and each term serves a different purpose within the qualified immunity analysis. Cf. Ulrich v. Pope Cnty., 715 F.3d 1054, 1059 (8th Cir. 2013) ("Notwithstanding the distinction between the two legal concepts, an analysis of arguable probable cause necessarily includes consideration of probable cause."). In Ross v. City of Jackson and Schaffer v. Beringer, we expressly stated that the issue of *arguable* probable cause is properly part of the resolution of qualified immunity's second prong, the clearly established prong. See Ross, 897 F.3d 916, 921 (8th Cir. 2018) ("[When] determining whether an officer is entitled to qualified immunity for a warrantless arrest—i.e., whether the Fourth Amendment right was clearly established—we have explained: '[a]n officer . . . is entitled to qualified immunity for a warrantless arrest if the arrest was supported at the time by at least "arguable probable cause."'" (third alteration in original) (citation omitted)); Schaffer, 842 F.3d 585, 592 (8th Cir. 2016) ("[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." (citation omitted)).

In other opinions, though not expressly, we have assigned consideration of *actual* probable cause to our constitutional violation prong analysis while reserving any consideration of *arguable* probable cause for our clearly established prong analysis. See, e.g., Just, 7 F.4th at 768 (relying on Ross to resolve qualified immunity analysis on clearly established prong because at least arguable probable cause existed); Bell, 979 F.3d at 603-09 (including actual probable cause determination within constitutional violation prong analysis and arguable probable cause determination within clearly established prong analysis); Baribeau v. City of Minneapolis, 596 F.3d 465, 478-79 (8th Cir. 2010) (finding no arguable probable cause because "[t]he state of the law at the time of the arrests was clearly established

-8-

such that a reasonable person would have known there was no probable cause to arrest the plaintiffs").

Notably, the Supreme Court has also treated the doctrines of actual probable cause and arguable probable cause as pertaining to the qualified immunity analysis this way, finding that the law was not clearly established and the defendant-officers were entitled to qualified immunity where those officers "reasonably but mistakenly conclude[d] that probable cause [wa]s present." Wesby, 138 S. Ct. at 591 (alterations in original) (citation omitted). In sum, "even if an officer arrests an individual without *actual* probable cause—in violation of the Constitution—he has not violated that individual's 'clearly established' rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." Toole v. City of Atlanta, 798 F. App'x 381, 385 (11th Cir. 2019) (per curiam).

The district court chose to resolve its qualified immunity analysis on the constitutional violation prong, finding that because Officers Boettigheimer and Korte had probable cause to arrest Brown and because Officers Boettigheimer and Korte and Detective Steiger had probable cause to then initiate charges against Brown, the officers did not violate Brown's constitutional right to be free from unlawful seizure (Claims 1 and 5), malicious prosecution (Claims 2 and 6), and retaliation for exercising his First Amendment rights (Claim 3). See R. Doc. 131, at 7 ("Because probable cause existed to arrest and prosecute [Brown], all his claims fail."). We decline to decide whether the officers had probable cause, choosing instead to begin and end our analysis on the clearly established prong, as is our prerogative. See Blazek, 761 F.3d at 923; Pearson, 555 U.S. at 242.

Turning to the ordinance for which Brown was arrested and prosecuted, Section 15.46.030 provides, in relevant part:

> Any person who shall disturb the peace of others by noisy, riotous or disorderly conduct, or by violent, tumultuous, offensive or obstreperous conduct or carriage, or by loud and unusual noises, or by unseemly,

profane, obscene, indecent, lewd or offensive language, calculated to provoke a breach of the peace . . . shall be guilty of a misdemeanor.

The Missouri Supreme Court, interpreting this ordinance and relying on the Supreme Court's interpretation of similar ordinances, explained that the ordinance criminalizes only "acts or conduct inciting violence or intended to provoke others to violence." City of St. Louis v. Tinker, 542 S.W.2d 512, 516 (Mo. 1976) (en banc). It further explained that "[t]he obvious purpose of the ordinance is to prevent violence by imposing a sanction on conduct reasonably calculated to cause immediate violence," recognizing that when a police officer is deciding whether to arrest someone pursuant to this ordinance, he must consider not only "[t]he conduct or language used by the speaker" but also "its probable effect . . . viewed in the setting in which it occurs." Id. at 519. The question that we must answer, therefore, is whether, at the time of Brown's arrest, "it was objectively reasonable for the officers to mistakenly believe, under the totality of the circumstances," that Brown was engaged in acts or conduct inciting violence or intended to provoke others to violence. See Hoyland v. McMenomy, 869 F.3d 644, 652 (8th Cir. 2017). After considering the totality of the circumstances, including the facts known by Officers Boettigheimer and Korte at the time of Brown's arrest, we find that it was.

The SLMPD assigned dozens of its officers to this rally, and approximately 1,000 rallygoers attended the event. The officer assignments for the day included everything from basic security assignments inside and outside the venue to tactical units ready to respond to emergencies that might arise during the rally. Officer Boettigheimer explained in his deposition that in advance of the rally, he learned of violent incidents that had occurred at other Trump rallies. Then, during the rally and while Officer Boettigheimer was stationed approximately 100 feet from Brown, Brown laughed loudly before standing, ultimately getting "nose-to-nose" with a fellow rallygoer and yelling at other rallygoers and Trump. Officer Boettigheimer testified in his deposition that the disturbance was growing, and he believed that it needed to be "quell[ed] . . . immediately." Notably, Brown's erratic behavior

continued as he was escorted out of the auditorium: Brown began resisting and turned to yell and gesture wildly at the crowd and Trump.

In light of these facts, as corroborated by Exhibit A, it was objectively reasonable for Officers Boettigheimer and Korte to believe that Brown's behavior was inciting violence or was intended to provoke other rallygoers to violence. It is possible that Brown was not actually inciting violence or intending to incite violence. The state court, when acquitting Brown of the charge against him, explained that the evidence did not sufficiently show that Brown had used fighting words, as required by Tinker. See R. Doc. 120-3, at 7; Tinker, 542 S.W.2d at 516. Regardless, when determining whether an officer is entitled to qualified immunity, we account for objectively reasonable mistakes. See Anderson, 483 U.S. at 641. Therefore, we find that Officers Boettigheimer and Korte had arguable probable cause to arrest and then initiate prosecution against Brown, meaning that it was not clearly established that doing so would violate Brown's right to be free from unlawful seizure, malicious prosecution, or First Amendment retaliation. Thus, we affirm the district court's grant of qualified immunity to Officers Boettigheimer and Korte.

Turning to Detective Steiger and assuming without deciding that Detective Steiger, who was not present at the rally and who simply wrote the incident report documenting Brown's arrest, initiated prosecution against Brown, we find that he was also entitled to qualified immunity. Our Court and the Missouri Supreme Court have held that malicious prosecution claims fail where probable cause existed to support the plaintiff's arrest and the initiation of criminal prosecution against the plaintiff. See Joseph, 712 F.3d at 1228; Kurtz, 245 F.3d at 757. As previously explained, Brown's arrest was supported by arguable probable cause, as was the prosecution initiated subsequent to that arrest. Therefore, as with Officers Boettigheimer and Korte, the district court properly granted qualified immunity to Detective Steiger because it was not clearly established that initiating prosecution

against Brown would violate his Fourth Amendment right to be free from malicious prosecution or his corresponding right under Missouri law.[3]

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment.

_____

[3]The district court first resolved Claim 2, Brown's malicious prosecution claim brought pursuant to § 1983 against the officers, by relying on Kurtz and concluding that Brown could not "sustain a civil rights claim under § 1983." R. Doc. 131, at 11 (quoting Kurtz, 245 F.3d at 758)). It then held, in the alternative, that regardless of Kurtz, "the presence of probable cause in this case to prosecute [Brown] would defeat the claim." R. Doc. 131, at 11. Because we find that the officers had arguable probable cause to arrest and initiate prosecution against Brown, we resolve the claim on that basis. Cf. Johnson v. City of Minneapolis, 901 F.3d 963, 971 (8th Cir. 2018) ("[W]e may 'affirm the district court on any basis supported by the record.'" (citation omitted)).