# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-1036
_____

Anne Francisco, parents; Thurman Francisco, parents; Tyler Francisco, son of
Joshua Francisco, deceased

*Plaintiffs - Appellants*

v.

Corizon Health, Inc.; Corizon, LLC

*Defendant*s

Tom Villmer; Gregory Rhodes; Kimberly Scallion; Jason England; Michael Griffin

*Defendants - Appellees*

Lisa Sanderson; Moses Ambilichu; Marion McIntyre; Rajendra Gupta; Does, 1-30

*Defendant*s
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: November 14, 2023
Filed: July 26, 2024
_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.
_____

ERICKSON, Circuit Judge.

The parents and child of Joshua Francisco (the "Family") appeal the district court's[1] grant of summary judgment in favor of Thomas Villmer, Gregory Rhodes, Kimberly Scallion, Jason England, and Michael Griffin in this 42 U.S.C. § 1983 action alleging a violation of the Eighth Amendment. We affirm.

## I. BACKGROUND

On July 22, 2014, Joshua Francisco was placed at the Farmington Correctional Center ("FCC") to serve his sentence for aggravated stalking. At that time, Rhodes, England, Griffin, and Scallion were correctional officers at FCC. Rhodes was a Functional Unit Manager, England was a sergeant, Griffin was a Corrections Officer I, and Scallion was a case manager. Villmer was the warden.

Francisco suffered from mental illness, and FCC provided him with treatment. The Missouri Department of Corrections contracted with Corizon to provide professional mental health services to Francisco and other inmates at FCC.

During Francisco's 93 days at FCC, correctional officers placed him on suicide watch four times when his statements or actions indicated that he might be a danger to himself. Corizon mental health professionals performed an evaluation of Francisco before they determined he was well enough to leave suicide watch each time. When Francisco refused to take the prescribed medication for his schizoaffective disorder, bipolar type, mental health professionals held an involuntary medication hearing to ensure Francisco took his medication.

---

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

At Francisco's request, on October 2, 2014, FCC placed him in protective custody. On October 8, 2014, the Admissions/Discharge committee determined Francisco was eligible for the Social Rehabilitation Unit ("SRU"), which would provide him with more frequent contact with mental health professionals. When the time came for Francisco to move to SRU, he refused.

On October 21, 2014, a mental health professional performed rounds in the administrative segregation unit. Francisco denied having any mental health concerns or complaints, and the doctor observed him to be "functioning adequately."

On the morning of October 22, 2014, Francisco's cellmate told England that Francisco was suicidal and that there was a noose in their cell. Francisco repeatedly told England and Griffin that he was not suicidal. England ordered a cell search and a strip search of Francisco and his cellmate. Neither search produced a noose.

Scallion separately interviewed Francisco on October 22, and Francisco also told her that he was not suicidal and had no intention of hurting himself. Despite Francisco's repeated statements to correctional officers that he was not suicidal, a correctional officer found Francisco hanging from a light fixture at approximately 9:20 that night.

## II. DISCUSSION

Our review of the district court's grant of summary judgment is *de novo*. Corwin v. City of Independence, 829 F.3d 695, 698 (8th Cir. 2016). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003) (quoting Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994)).

A.    Deliberate Indifference

A government official is protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). To defeat the protection of qualified immunity, the plaintiff must (1) assert a violation of a constitutional or statutory right, (2) that was "clearly established" at the time of the violation, and (3) that a "reasonable official would have known that the alleged action indeed violated that right." Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998).

The Family have met the first two steps of this inquiry. It is clearly established that the Eighth Amendment's prohibition on cruel and unusual punishment applies to protecting prisoners from deliberate indifference to serious medical needs and that a risk of suicide by an inmate is a serious medical need. Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000). To overcome qualified immunity then, the Family must present a genuine dispute about a predicate material fact regarding the third step of the inquiry.

Whether a reasonable official would have known that his actions violated an established right involves both an objective and subjective component. Liebe, 157 F.3d at 577. The objective component concerns whether a serious deprivation occurred. Id. The subjective component examines the official's state of mind to determine whether he acted with deliberate indifference. Id.

Deliberate indifference is more than negligence or gross negligence. See Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006) (gross negligence is insufficient to establish deliberate indifference); Lambert v. City of Dumas, 187 F.3d 931, 937 (8th Cir. 1999) (negligence is insufficient to establish deliberate indifference). Deliberate indifference must rise to the level of criminal recklessness. Gregoire, 236 F.3d at 417. There must be a "strong likelihood" that the inmate would harm himself. Lambert, 187 F.3d at 937 (citations omitted). Even when an official knows

of the strong likelihood of risk of suicide by an inmate, the official is not liable for a subsequent injury if he responded reasonably.  Gregoire, 236 F.3d at 418.

The Family alleges that several correctional officers failed to follow the FCC's written suicide intervention policy, which they argue creates a dispute of material fact.  Regardless of whether any officer failed to follow a written policy, the "[f]ailure to follow written procedures does not constitute *per se* deliberate indifference."  Luckert v. Dodge County, 684 F.3d 808, 819 (8th Cir. 2012).  The relevant inquiry is whether the official's acts violated Francisco's constitutional rights.  We turn now to address each official's conduct.

### 1.    *England*

On October 22, correctional officer Joseph Gooch notified England that Francisco's cellmate claimed Francisco was suicidal and had a noose.  England did not ignore the allegation.  Instead, England immediately performed an investigation.

England interviewed Francisco, who repeatedly told England that he was not suicidal.  This was England's first and only interaction with Francisco, and England had no knowledge of Francisco's suicide watch history at that time.

In an attempt to create a dispute of material fact against England, the Family claims that Darrell Wagganer wrote in his suicide investigation report that England did not talk to Francisco.  A review of the report reveals the opposite.  Wagganer noted multiple times that England spoke to Francisco and that Francisco repeatedly told England that he was not suicidal.  Wagganer also wrote that he interviewed Gooch, who was a witness to England's conversation with Francisco, and he corroborated England's statements that Francisco repeatedly stated he was not suicidal.  Therefore, it is undisputed that England talked to Francisco who told England he was not suicidal.

In addition to Francisco's statements to England, it is undisputed that England ordered two searches, and neither produced a noose. Cellmate claims about the condition of a fellow inmate are insufficient to put guards on actual notice of an excessive risk to an inmate's safety. Yellow Horse v. Pennington County, 225 F.3d 923, 928 (8th Cir. 2000). In this case, the cellmate's statements were especially unreliable when it turned out his claim about the presence of a noose was revealed to be false following the searches. England's actions do not rise to the level of criminal recklessness required for deliberate indifference. Gregoire, 236 F.3d at 417.

### 2. *Griffin*

In response to Gooch's radio call for England, Griffin arrived at Francisco's cell shortly after England started his investigation. Griffin heard the cellmate state that Francisco was "driving me nuts and he's suicidal." From previous experience, Griffin knew that inmates had falsely claimed that their cellmate was suicidal because they didn't like the cellmate and wanted a new one.

Griffin was aware that Francisco had previously been on suicide watch, but he heard Francisco adamantly tell England at least twice on October 22 that he was not suicidal. On October 21, the same day the mental health professional determined Francisco was not at risk of self-harm, Francisco also told Griffin that he was not suicidal. Because England was his superior, Griffin left the decision to him on whether to remove Francisco from his cell. Griffin did not act with deliberate indifference. See Yellow Horse, 225 F.3d at 928 (finding no disregard for an excessive risk to the inmate's health or safety).

### 3. *Scallion*

Scallion also interviewed Francisco on October 22. Francisco told her that he was not suicidal. She was also aware that no noose was discovered during the cell search and strip search.

-6-

Scallion had a history with Francisco that included talking with him on a daily basis, and she believed she had developed a rapport with him. In the past, when Francisco felt suicidal, he told Scallion. Scallion knew Francisco's suicide watch history. However, an inmate's previous suicidal tendencies do not require officials to regard him as indefinitely suicidal. See id. (finding no deliberate indifference when the inmate was placed on, and removed from, suicide watch twice in the span of five days); see also Brabbit as Tr. for Bild v. Capra, 59 F.4th 349, 354 (8th Cir. 2023) (per curiam) (finding no deliberate indifference when officials removed inmate from the highest level of supervision after inmate stated he was no longer suicidal).

On October 21, Francisco's cellmate told Scallion that "something bad was going to happen." Scallion talked to Francisco, and he stated that he was not suicidal. A mental health professional also met with and evaluated Francisco on October 21 and determined that Francisco was not suicidal.

Scallion observed a gradual improvement in Francisco's behavior prior to his death. Based on Scallion's previous history with Francisco when he would admit he was suicidal, and his statements to her on October 22 that he was not suicidal, Scallion's decision[2] to take no further action does not rise to the level of criminal recklessness. Gregoire, 236 F.3d at 417.

### 4. Rhodes

Rhodes did not talk to Francisco on October 22. He talked to Scallion and two other case managers about Francisco. In addition, Rhodes reviewed the video recording of the searches involving Francisco, which corroborated the correctional officers' statements that there was no noose.

---

[2]The Family cites Scallion's testimony where, after she learned of Francisco's death, she wished she would have put him on suicide watch. Hindsight is not the test for deliberate indifference. Gregoire, 236 F.3d at 419. Instead, we must evaluate the official's actions based upon the information she knew prior to the death. Id.

While Rhodes knew that Francisco had previously been on suicide watch, prior suicide watch history alone is insufficient to establish that Francisco was suicidal on October 22. See Yellow Horse, 225 F.3d at 928 (finding no deliberate indifference when the inmate was removed from suicide watch following improvement in his mental condition). Rhodes knew that there was an allegation of a noose in the cell and proof that the allegation was false. He relied on the information provided by Scallion and two other case managers regarding Francisco's state of mind that day. Rhodes' conduct fails to constitute deliberate indifference. Id.

### 5. *Villmer*

Villmer was neither aware of the cellmate's allegations nor participated in the decisions made regarding Francisco on October 22. It is undisputed that he was not aware of the events until after they occurred. Therefore, the district court properly granted summary judgment to Villmer on the deliberate indifference claim.

### B. Monell Liability

The remaining claim against Villmer is for an unconstitutional custom, practice, or policy. Liability for an unconstitutional custom, practice, or policy under 42 U.S.C. § 1983 rests with the responsible governmental entity. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); see also Corwin, 829 F.3d at 700 (discussing a municipality's liability for a policy or custom). Because Villmer is not a governmental entity, he is not a proper party for this claim.

The Family next conflates Monell liability with a claim for failure to properly supervise or train. The Family did not allege a claim for failure to supervise or train against Villmer in their Complaint, so this claim is not properly before us. See Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1006 (8th Cir. 2012) (stating that a court must refuse to consider claims not alleged in the complaint).

Finally, the Family returns to the deliberate indifference standard to argue that Villmer is liable for an unconstitutional custom or practice. In the context of a custom or practice, there must be personal involvement by the supervisor in "creating, applying, or interpreting a policy . . . ." Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014).

The alleged custom or practice is that an inmate must say the "magic words" that he is suicidal before he will be placed on suicide watch and no other words or indicia of intent to harm oneself will suffice. It is undisputed that Villmer did not make such a policy. It is also undisputed that Corizon, not Villmer, was responsible for training FCC staff on suicide prevention. Because there was no personal involvement by Villmer in the alleged "magic words" custom or practice, this claim also fails. Id.

Finally, on the topic of a "magic words" policy, to the extent any correctional facility has a policy or custom that requires placing an inmate on suicide watch only when the inmate tells a guard he is suicidal, such a policy is unacceptable. If correctional officials have sufficient other indicators from the inmate of intent to harm oneself or credible witness testimony to that effect, then staff should attempt[3] to protect the inmate from himself. For example, at one point, Francisco used a piece of glass to make superficial cuts on his skin, and a correctional officer placed him on suicide watch in the absence of Francisco stating he was going to harm himself. A correctional facility's policy should contain language that requires action under similar circumstances.

## III.   CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

_____

_____

[3]"Jails are neither required to provide suicide-proof institutions, nor must they ensure against suicide ever happening." Brabbit as Tr. for Bild, 59 F.4th at 353 (citations omitted).