# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3233

_____

Fred Watson

*Plaintiff - Appellant*

v.

Eddie Boyd, III; City of Ferguson, Missouri

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 10, 2024
Filed: October 21, 2024

_____

Before SMITH, Chief Judge,[1] GRUENDER, and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

Following a police interaction between Fred Watson and Officer Eddie Boyd, III, at a Ferguson, Missouri park, Watson filed suit against the City of Ferguson,

_____

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

Missouri (City), and Officer Boyd for violation of his civil rights. *See* 42 U.S.C. § 1983. Against Officer Boyd, Watson alleged unlawful search and seizure, in violation of the Fourth and Fourteenth Amendments (Count I); unlawful retaliation, in violation of the First Amendment (Count II); and malicious prosecution, in violation of the Fourth and Fourteenth Amendments (Count III). Watson also alleged a municipal liability claim against the City (Count IV). The district court granted summary judgment to the defendants. Watson appeals. We affirm on all but the district court's grant of summary judgment on Watson's First Amendment use-of-force retaliation claim because a disputed question of fact remains as to that claim.

## I. *Background*[2]
### A. *Underlying Facts*

On August 1, 2012, Watson returned to his parked car after playing basketball at a City park. Watson rested in the running vehicle, with the air conditioner on and the driver's side window partially down.

Officer Boyd, at that time, was patrolling the park. He maintains that "a spate of recent car break-ins" had occurred. R. Doc. 100, at 1. According to Officer Boyd, at approximately 8:17 p.m., he saw a parked vehicle with excessively tinted windows and no front license plate idling with its headlights on near an area where children were playing. "Both Missouri law and the Ferguson City Code of Ordinances ('City Code') restrict vision-reducing material applied to the windows and windshield of a car." *Watson v. City of Ferguson*, No. 4:17-cv-2187 JCH, 2022 WL 16569365, at \*5 (E.D. Mo. Sept. 26, 2022) (citing Mo. Rev. Stat. § 307.173; City Code § 44-404). Missouri law also "requires, with certain exceptions not relevant here, that license

---

[2]We recite the facts in the light most favorable to Watson as the non-movant. *See Smith-Dandridge v. Geanolous*, 97 F.4th 569, 575 (8th Cir. 2024).

plates be fastened to the front and rear of motor vehicles." *Id.* (citing Mo. Rev. Stat. § 301.130.5). Officer Boyd parked his car near the vehicle and approached on foot.[3]

As he walked toward the vehicle, Officer Boyd unsnapped his gun holster. Watson "lower[ed] the window more as [Officer Boyd] approached the car so [they could] have an exchange" and so Officer Boyd could "see" Watson. R. Doc. 187-2, at 12.[4] Officer Boyd asked Watson, "[D]o you know why I pulled you over, do you know why I stopped you"? *Id.* Watson responded, "Sir, you didn't pull me over, you didn't stop me, I've been sitting here 10, 15 minutes in the park." *Id.* Officer Boyd then directed Watson to state his Social Security number. Watson refused. Officer Boyd responded with a series of "hypotheticals" to justify his request, including that Watson "could be a pedophile." *Id.* at 13.

"At some point[,] [Watson] asked [Officer Boyd for] his name and his badge number, [but] he refused . . . ." *Id.* at 15. Officer Boyd became "visibly upset" and told Watson, "[N]o, you don't need that, it will be on your ticket." *Id.* at 29. Watson replied, "[W]hat ticket[?] I have not broken any law." *Id.* Officer Boyd responded, "I think your tint is too dark[,] and I could give you a ticket for that." *Id.* Watson replied, "[S]ir, that's fine." *Id.* During this exchange, Watson's hands were on the steering wheel. After Officer Boyd informed Watson about the ticket, Watson removed his right hand from the steering wheel to reach for his phone located "next to the steering wheel . . . where the . . . navigation system [was]." *Id.* at 29. Officer Boyd then yelled, "[P]ut your f***ing phone down and put your hands on the steering wheel." *Id.* He

---

[3]Officer Boyd asserts that he pulled his police cruiser adjacent to Watson's car; Watson maintains that Officer Boyd parked directly in front of his car, thereby blocking it.

[4]Officer Boyd contends that the vehicle's windows were so dark that he was unsure whether the car was occupied until he approached and saw movement inside. Officer Boyd further maintains that he was able to see only that Watson was not wearing his seatbelt.

told Watson, "[B]ecause of police safety[,] don't start reaching around grabbing stuff." *Id.* at 16. Watson complied and "put it down." *Id.* Watson returned his hands to the steering wheel. Officer Boyd called for backup. Officer Boyd then "pulled his gun" and said, "I can shoot you right here" "[a]nd nobody will give a s**t." *Id.* at 18.

Officer Boyd ordered Watson to "throw the keys out of the car." *Id.* at 18. He also asked for Watson's driver's license and registration. In his deposition, Watson agreed that he "refused [Officer Boyd's] request to throw the keys out" of the car. *Id.* at 17. Watson replied that he could not throw the keys out of the window or retrieve the driver's license because his key fob[5] and driver's license were in a pair of pants folded up on the back seat. Watson told Officer Boyd that his registration was in the glove compartment. Officer Boyd ordered Watson to exit the vehicle, and "Watson admits that he did not exit the vehicle before backup came, for fear of his life." R. Doc. 194, at 8.

At some point, Officer Boyd asked Watson his name. *See id.* at 14 ("[Officer Boyd] asked me [Watson] about my name . . . This was after the pedophile [comment], this is after [he stated,] [']I can write you a ticket for tint . . . .[']"); *see also id.* ("[Q.] All right. But now you recall him asking your name, is that right? Before he asked you to throw the keys out of the window, is that accurate? [A.] I [Watson] don't recall the sequence of those two things."). Watson replied, "Fred Watson." *Id.* at 14. Watson's legal name is "Freddie Watson"; however, he goes by "Fred Watson." *Id.* at 15. Officer Boyd also asked for Watson's address. Watson gave a Florida address but was actually living in Illinois at the time of the stop. According to Officer Boyd, he tried to locate the name "Fred Watson" in REJIS, a computer system that law enforcement agencies use to identify individuals, including locating their driver's license information. He could not locate "Fred Watson" in the database.

---

[5]Watson's car started remotely with the key fob.

Once backup arrived, Watson exited the vehicle with his hands raised. After exiting, Watson closed the door with his foot because he did not want the police to search his vehicle. Officer "Boyd handcuffed Watson, squeezing the cuffs . . . , and placed [him] in the back of [Officer] Boyd's police car." R. Doc. 137, at 6 (Sealed). He then searched Watson's vehicle and the items therein, including a book bag, pants, the glove compartment, and the center console. According to the police report, Officer Boyd conducted the search incident to arrest. Officer Boyd located documentation indicating that Watson's legal name was "Freddie Watson," not "Fred Watson."[6] Officer Boyd located "Freddie Watson" in REJIS. The REJIS search indicated that Watson had "an expired operator's license through Missouri that had not been surrendered to another state." R. Doc. 187-1, at 31. Specifically, the search revealed that "Freddie D[.]" "Watson" had a "resident address" in "St[.] Louis, MO," where he had a "valid expired" Missouri driver's license that was never "surrendered." *Id.* at 37 (all caps omitted). The REJIS report listed a "current address" for Watson in "Fairview Hts[.], IL." *Id.* (all caps omitted). Another REJIS search completed shortly thereafter indicated that Watson's vehicle was registered and insured in Florida. *See id.* at 38. "It is undisputed that Watson's vehicle had a Florida license plate, and [it] did not have an inspection sticker." *Watson*, 2022 WL 16569365, at *2.

Officer Boyd issued Watson seven tickets: "no operator's license in possession; no proof of insurance; vision reducing material applied to windshield[7]; expired state operator's license; no seat belt; failure to register an out[-]of[- ]state motor vehicle

---

[6]Watson testified that he took pictures of the belongings that were in his car after the search. He said that he "point[ed] out [his] driver's license [on] the floor" and his "registration." R. Doc. 196-3, at 52. Watson further confirmed that his "current driver's license" was "issued out of . . . Florida." *Id.* at 79–80.

[7]"Although Officer Boyd had a device that measured tint on windows, he did not use the device to measure whether Watson's windows or windshield were tinted." *Id.* at *3 n.13.

within 30 days of residence; and no vehicle inspection." *Id.* at *3. Additionally, Watson was charged with two more offenses written on complaints instead of tickets: making a false statement and failure to obey the orders of a police officer. Watson learned of these additional charges when his attorney received the complaints from the prosecutor.

Watson contested the charges. He subsequently received notice that the tickets were either stayed or paid off, despite Watson never pleading guilty to any of the charges or paying the fines. The City ultimately dismissed all the charges.

## B. *Procedural History*

Watson filed suit in federal court. He brought the following claims against Officer Boyd under § 1983: (1) violation of his Fourth and Fourteenth Amendment rights to be free from unlawful searches, seizures, and force (Count I); (2) violation of his First Amendment right to be free from retaliation for requesting Officer Boyd's name and badge number (Count II); and (3) violation of his Fourth and Fourteenth Amendment right to be free from malicious prosecution (Count III). He also brought *Monell*[8] claims under § 1983 (Count IV) against the City for the following: (1) maintaining a custom of unconstitutional conduct by police officers; (2) failing to adequately screen Officer Boyd during the hiring process; (3) inadequately training Officer Boyd; and (4) failing to supervise or discipline Officer Boyd.

Officer Boyd and the City (collectively, "defendants") jointly moved for summary judgment. The district court concluded that Officer Boyd was not entitled to qualified immunity on Watson's claims of unlawful seizure, search, force, and retaliation because the parties disputed the facts in their entirety and a reasonable jury could find in favor of Watson. The district court granted summary judgment based on qualified immunity to Officer Boyd on Watson's malicious-prosecution claim. The

---

[8]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

court reasoned that the Eighth Circuit had not yet recognized such a claim under § 1983. Finally, the district court generally denied the City's motion for summary judgment on Watson's *Monell* claims based on its finding that Officer Boyd was not entitled to qualified immunity for the underlying conduct. Although the court granted summary judgment to the City on Watson's inadequate-training claim, it concluded that a reasonable jury could find that the City had maintained a custom of unconstitutional conduct, failed to screen Officer Boyd, and failed to supervise or discipline Officer Boyd. As a result, it denied the City's request for summary judgment on those claims.

Officer Boyd and the City filed an interlocutory appeal of the district court's denial of qualified immunity and summary judgment. On appeal, we "pass[ed] no judgment on whether Officer Boyd is entitled to qualified immunity because the district court failed to undertake the necessary analysis." *Watson v. Boyd*, 2 F.4th 1106, 1114 (8th Cir. 2021). As a result, "we vacate[d] the district court's order and remand[ed] the case for a more detailed consideration and explanation of the validity, or not, of Officer Boyd's claim to qualified immunity in a manner consistent with [our] opinion." *Id.* We dismissed the City's appeal for lack of jurisdiction. *Id.*

On remand, the defendants filed a new motion for summary judgment based on qualified immunity and Watson's failure to establish constitutional violations. The district court granted the motion on all counts.

### 1. *Unlawful Search and Seizure (Count I)*

In Count I, Watson asserted that Officer Boyd is liable for an unlawful search and seizure. He asserted that Officer Boyd violated his Fourth Amendment rights by (1) stopping and arresting him without probable cause; (2) seizing him unreasonably by pointing a gun at his head at close range; (3) seizing him unreasonably by initiating charges against him; and (4) conducting an illegal search by ransacking Watson's car after having unlawfully arrested him.

a. *Stop Without Probable Cause*

The district court assumed that a fact question remained as to whether Watson's front windshield was excessively tinted. But it found that fact question immaterial because no dispute existed that Watson's car lacked a front license plate. *See* Mo. Rev. Stat. § 307.173; City Code § 44-404. As a result, it granted summary judgment to the defendants on this issue.

b. *Arrest Without Probable Cause*

Officer Boyd asserted that he "had probable cause, or at least arguable probable cause, to believe that Watson had committed numerous offenses, any one or all of which justified his arrest." *Watson*, 2022 WL 16569365, at *6. The district court agreed and granted summary judgment on this issue. It analyzed the offenses as follows.

i. *Failure to Provide Driver's License and Proof of Insurance*

Officer Boyd argued that "he had probable cause or arguable probable cause to cite and arrest Watson both for failure to provide a driver's license and for failure to provide proof of insurance." *Id.* The court found it "undisputed that Officer Boyd asked Watson to provide his driver's license and proof of insurance, and that Watson failed to provide either." *Id.* Based on Watson's failure to provide this information, the court concluded that "Officer Boyd had at least arguable probable cause to arrest Watson and issue the two citations." *Id.*

ii. *Windshield*

Officer Boyd claimed he had probable cause or arguable probable cause to arrest Watson based on his heavily tinted windows. The court found it "undisputed that Watson's vehicle windows contained tint." *Id.* at *7. Missouri law prohibits excessive tint on windows. The court reasoned that "even if Officer Boyd ultimately was wrong, . . . he still possessed at least arguable probable cause to issue the citation." *Id.*

-8-

### iii. *Expired Driver's License*

Officer Boyd asserted that "he had probable cause or arguable probable cause to cite and arrest Watson for operating a vehicle under an expired state driver's license, because the REJIS system indicated that Watson's Missouri driver's license was expired and had not been surrendered to another state." *Id.* The court concluded that Officer Boyd had at least arguable probable cause to arrest Watson for an expired driver's license based on (1) his "determin[ation] that Watson's Missouri license had never been surrendered"—"as required to obtain a license in another state"—and had expired, and (2) Officer Boyd's inability "to locate a driver's license for Watson in any other state." *Id.*

### iv. *Seat Belt*

Officer Boyd maintained that he had probable cause or arguable probable cause to arrest Watson for "not wearing his seatbelt" while he was "sitting in his running vehicle, in a public park." *Id.* at *8. The court concluded that Officer Boyd had at least arguable probable cause to cite and arrest Wilson based on these undisputed facts.

### v. *Vehicle Registration/Inspection Sticker*

Officer Boyd argued that "he had probable cause, or at least arguable probable cause, to believe that Watson's vehicle was required to be registered in the state of Missouri based on the information located in REJIS" "that Watson was a Missouri resident [with an expired Missouri driver's license] who had failed to register his vehicle under Missouri law." *Id.* at *9. Furthermore, he asserted "he had probable cause to believe Watson was in violation of [Missouri] law for failure to have an inspection approval sticker." *Id.* The court concluded that "Officer Boyd had ample evidence that any alleged Florida registration was invalid, as Watson's car should have been registered in Missouri." *Id.*

### vi. *Failure to Obey*

Officer Boyd claimed that he had probable cause to arrest Watson for his refusal to comply with Officer Boyd's command "to throw his keys out of the window and exit his vehicle." *Id.* The court concluded "that Officer Boyd had at least arguable probable cause to believe Watson was disobeying his order" based on the undisputed fact that "Watson refused to comply with his demands." *Id.*

### vii. *False Statement*

Officer Boyd argued that he had probable cause or arguable probable cause to arrest Watson for making two material false statements: "identif[ying] himself as 'Fred Watson' rather than 'Freddie Watson'" and "provid[ing] a false Florida address, when Watson knew he did not reside in Florida." *Id.* at *10. The court concluded that Officer Boyd had at least arguable probable cause to issue the citation to Watson for providing a false statement based on the undisputed facts. According to the court, although a fact issue may exist "as to whether Watson's answers were willfully or knowingly deceitful, that question does not affect whether Officer Boyd had at least arguable probable cause to believe Watson uttered at least one false declaration" based on the undisputed facts. *Id.*

### c. *Excessive Force*

Watson alleged that when "he moved his hand from the top of the steering wheel to the console above the radio, in an effort to reach his phone and call the police[,] . . . . Officer Boyd directed Watson not to use the phone and to keep his hands on the steering wheel, allegedly for officer safety purposes." *Id.* Watson further alleged that Officer Boyd pulled his gun on Watson "after Watson put his phone back down." *Id.* at *11. Watson claimed that when Officer Boyd pulled his gun and pointed it at Watson for ten seconds, Officer Boyd told Watson that "he could shoot Watson right then and nobody would give a damn." *Id.* at *10.

The court concluded that Officer Boyd had "an objectively reasonable concern for officer safety or suspicion of danger" when he pulled his gun because he "was facing a non-compliant occupant of a vehicle who made a movement within the vehicle." *Id.* at \*11. Alternatively, the court determined "that even if Officer Boyd did violate Watson's constitutional rights," "it was not clearly established that Officer Boyd's alleged act of pulling his gun for ten seconds on a non-compliant suspect constituted an unreasonable seizure under the Fourth Amendment." *Id.* at \*11–12.

### d. *Search*

Officer Boyd claimed his warrantless search of Watson's vehicle was lawful as a search incident to arrest or under the automobile exception. The court concluded that Officer Boyd's "warrantless search of Watson's vehicle was lawful as a search incident to arrest" because "Officer Boyd had probable cause or arguable probable cause to arrest Watson for, *inter alia*, . . . no operator's license in possession, no proof of insurance, and providing false declarations." *Id.* at \*12. Alternatively, the court concluded that any violation of a constitutional right was not clearly established.

### 2. *Unlawful Retaliation (Count II)*

In Count II, Watson asserted "two distinct claims" for First Amendment retaliation. Appellant's Br. at 22. First, he asserted that Officer "Boyd unconstitutionally used force by pointing his gun at him and threatening to shoot him in retaliation for . . . Watson questioning him." *Id.* (citing R. Doc. 35, at 18; R. Doc. 196-1, at 36). Second, he asserted that Officer "Boyd cited [him] for violating several municipal ordinances without probable cause in retaliation for [his] questioning [of Officer Boyd] and [his] attempt[] to report the encounter." *Id.*

The district court did not address the retaliatory use-of-force claim; instead, it addressed only the retaliatory-arrest claim. Officer Boyd argued that "Watson's claim for First Amendment retaliation fails because Officer Boyd had probable cause to

arrest and charge Watson." *Watson*, 2022 WL 16569365, at *13. The district court agreed and granted summary judgment to Officer Boyd.

### 3. Monell *Claims (Count IV)*

Based on its prior conclusions that Watson failed to state claims under § 1983 for unlawful search and seizure and unlawful retaliation, the court concluded that there could be no *Monell* liability on the part of the City.

## II. *Discussion*

On appeal, Watson argues that the district court erroneously granted summary judgment to the defendants on his First Amendment retaliation claim in Count II, his Fourth Amendment unreasonable search claim in Count I, and his *Monell* claim in Count IV.

"Viewing the facts in the light most favorable to the non-moving party, we review the district court's grants of summary judgment de novo." *Smith-Dandridge*, 97 F.4th at 575 (internal quotation marks omitted). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Francisco v. Corizon Health, Inc.*, 108 F.4th 1072, 1077 (8th Cir. 2024) (internal quotation marks omitted). "To decide whether an official is entitled to qualified immunity, we conduct a two-step inquiry: (1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional or statutory deprivation; and (2) whether the right was clearly established at the time." *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) (internal quotation marks omitted), *cert. denied*, 144 S. Ct. 1349 (2024). We may "consider [these steps] in either order." *Presson v. Reed*, 65 F.4th 357, 365 (8th Cir. 2023) (internal quotation marks omitted). A right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. While prior cases need not have

expressly determined that the action in question is unlawful, in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal quotation marks omitted).

## A. *First Amendment Retaliation*

Watson alleges that Officer Boyd unlawfully retaliated against him in violation of his First Amendment rights after Watson requested Officer Boyd's name and badge number. On appeal, he argues that the district court erroneously granted summary judgment in favor of the defendants on this claim by (1) erroneously concluding that probable cause existed to justify his arrest on his retaliatory-arrest claim and (2) failing to address his retaliatory use-of-force claim.

"Criticism of public officials lies at the very core of speech protected by the First Amendment." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (cleaned up), *abrogated on other grounds by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023). "Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up).

> To succeed on a First Amendment retaliation claim [Watson] must demonstrate: (1) he engaged in protected First Amendment activity; (2) Officer [Boyd] took an adverse action that would chill a person of ordinary firmness from continuing in that protected activity; and (3) there was a but-for causal connection between [Watson's] injury and Officer [Boyd's] retaliatory animus.

*Nieters*, 83 F.4th at 1110. As to the third element, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the

plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman*, 547 U.S. at 259). "[T]he motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398–99 (quoting *Hartman*, 547 U.S. at 260).[9]

## 1. *Retaliatory Arrest*

We will first address Watson's retaliatory-arrest claim. Watson argues that the district court erroneously granted summary judgment on this claim because Officer Boyd lacked arguable probable cause for five of the nine citations that he issued to Watson: (1) driving without a driver's license in his possession; (2) failing to register his vehicle; (3) failing to have an inspection sticker; (4) failing to obey; and (5) making a false statement.[10]

"For a number of retaliation claims, establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward." *Nieves*, 587 U.S. at 399. But "in other types of retaliation cases," "the consideration of causation is not so straightforward." *Id.* "[R]etaliatory arrest claims involve causal complexities . . . ." *Id.* at 401. "[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim 'must plead and prove the absence of probable cause for the arrest.'" *Gonzalez v. Trevino*, 144 S. Ct. 1663, 1665 (2024) (per curiam) (quoting *Nieves*, 587 U.S. at 402).

---

[9]"To the extent *Peterson* suggests that a *substantial factor* is enough, even in the absence of but-for causation, it is inconsistent with *Nieves* and no longer good law." *Laney*, 56 F.4th at 1157 n.2 (emphasis added) (cleaned up).

[10]Watson does not challenge the district court's conclusion that Officer Boyd had probable cause to issue him citations for violating the financial-responsibility ordinance, applying vision-reducing materials to his windshield, not wearing a seatbelt, and having an expired driver's license.

"Probable cause exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Brown v. City of St. Louis*, 40 F.4th 895, 900 (8th Cir. 2022) (internal quotation marks omitted). Courts "determine whether an officer had probable cause for an arrest" by "examin[ing] the events leading up to the arrest, and then decid[ing] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (internal quotation marks omitted). Whether probable cause exists to effectuate an arrest "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." *Id.* (internal quotation marks omitted). Probable cause "is an objective standard requiring that we afford officers substantial latitude in interpreting and drawing inferences from factual circumstances." *Id.* (cleaned up). The question is whether the "facts and circumstances [were] sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id.* (cleaned up). "[We] have assigned consideration of *actual* probable cause to our constitutional violation prong analysis . . . ." *Id.* at 901.

Distinct from the legal concept of "probable cause" is "arguable probable cause." *Id.* (recognizing that the terms "are not interchangeable"). "*[A]rguable* probable cause exists" "where the officers act on a mistaken belief that probable cause exists, if that mistake is objectively reasonable." *Id.* at 900–01 (internal quotation marks omitted). We consider whether arguable probable cause exists as "part of the resolution of qualified immunity's second prong, the clearly established prong." *Id.* at 901; *see also id.* ("[W]e have . . . reserv[ed] any consideration of *arguable* probable cause for our clearly established prong analysis."). "[N]o arguable probable cause" exists when "the state of the law at the time of the arrests was clearly established such that a reasonable person would have known there was no probable cause to arrest the plaintiffs." *Id.* (cleaned up).

-15-

"In sum, even if an officer arrests an individual without *actual* probable cause—in violation of the Constitution—he has not violated that individual's clearly established rights for qualified immunity purposes if he nevertheless had *arguable* probable cause to make the arrest." *Id.* (internal quotation marks omitted). Here, Watson argues that Officer Boyd lacked even *arguable* probable cause to issue the challenged citations. We disagree and affirm the district court's grant of summary judgment on the retaliatory-arrest claim.

a. *Driver's License*

Watson first asserts that Officer Boyd lacked arguable probable cause to issue the "suspended license citation" because Officer "Boyd had ample information that proved . . . Watson had a valid and current Florida driver's license." Appellant's Br. at 30. Specifically, Watson points to Officer Boyd's (1) REJIS search showing that Watson had a valid Florida driver's license, and (2) discovery of Watson's Florida driver's license during his search of Watson's car. *Id.*

As a threshold matter, Watson was not charged with having a suspended license but instead with driving without a driver's license in his possession. *See* R. Doc. 196-11, at 2. City Code § 44-81(a) provides that "[i]t shall be unlawful for any person to drive any motor vehicle . . . in the city unless such person shall have a driver's license . . . as required by state law, and shall have such license in possession at all times while so driving on the streets of the city." R. Doc. 187-4, at 5. Further, City Code § 44-81(c) provides that "[f]ailure to produce a driver's . . . license upon lawful demand shall give a police officer probable cause to arrest the driver." *Id.*

"[W]e have held that asking for [a] driver's license and registration papers is a reasonable part of the investigation following a justifiable traffic stop." *United States v. Smart*, 393 F.3d 767, 771 (8th Cir. 2005) (citing *United States v. Clayborn*, 339 F.3d 700, 702 (8th Cir. 2003) ("We have consistently held that a reasonable investigation following a justifiable traffic stop may include asking for the driver's

license and registration." (cleaned up)); *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001) ("Once a car is lawfully stopped, the police may request the driver's license and registration.")).

As the district court recognized, "It is undisputed that Officer Boyd asked Watson to provide his driver's license and proof of insurance, and that Watson failed to provide either." *Watson*, 2022 WL 16569365, at *6; *see also* R. Doc. 187-2, at 18 (stating that when Officer Boyd asked for Watson's "[driver's] license and registration," Watson kept his hands on the steering wheel and "told him it's in the back, [the] license is in [the] pants in the back [of the car]"). It was only during the search of Watson's vehicle that Officer Boyd located documentation with Watson's legal name on it. With this name, Officer Boyd was able to locate Watson in REJIS. Results showed that Watson had an valid expired Missouri driver's license.

Watson argues that, during the search, Officer Boyd found Watson's Florida driver's license. He contends that because Officer Boyd knew that Watson had a Florida driver's license, Officer Boyd lacked probable cause to cite him for *not* having a valid driver's license. But, based on the undisputed facts, Officer Boyd at least had arguable probable cause to believe that Watson's Florida driver's license was *not* valid. A REJIS search completed at 9:04 p.m. revealed that "Freddie D[.]" "Watson" had a "resident address" in "St[.] Louis, MO," where he had a "valid expired" Missouri driver's license that was never "surrendered." R. Doc. 187-1, at 37 (all caps omitted). The REJIS report listed a "current address" for Watson in "Fairview Hts[.], IL." *Id.* (all caps omitted). Another REJIS search completed at 9:46 p.m. indicated that Watson's vehicle was registered and insured in Florida. *See id.* at 38. But it also listed Watson's Illinois address. *See id*. Officer Boyd, who stopped Watson in Missouri, testified that because Watson "had an expired [Missouri driver's] license," he "believed that [Watson] was a Missouri resident." R. Doc. 187-1, at 21. The REJIS searches supported this belief. As the defendants correctly note, "Had Officer Boyd been correct [that Watson was a Missouri resident], Watson would not

have had a valid [Florida] driver's license because he was not a resident of Florida." Appellee's Br. at 22 (citing Mo. Rev. Stat. § 302.080(2) (providing that "[a] *nonresident* who is at least sixteen years of age and who has in his immediate possession a valid [driver's] license issued to him in his home state or country" is "exempt" from Missouri's license law (emphasis added)).[11]

As a result, we conclude that at least arguable probable cause existed for driving without a driver's license.

### b. *Vehicle Registration/Inspection Sticker*

Watson next argues that Officer "Boyd . . . lacked arguable probable cause to charge [him] with not having a Missouri inspection or registration, as he . . . had ample information that proved [his] car was lawfully registered in Florida, and had no information that suggested the car had to be registered and inspected in Missouri." Appellant's Br. at 31. Specifically, he asserts that REJIS shows that his "car was lawfully registered and insured and Florida," he "had a valid Florida license plate," he "provided his Florida address to [Officer] Boyd upon request," and Officer "Boyd found [Watson's] valid Florida registration when . . . searching his car." *Id.*

Under Missouri law, "[a]pplication for registration of a motor vehicle not previously registered in Missouri . . . and previously registered in another state shall be made within thirty days after the owner of such motor vehicle has become a resident of this state." Mo. Rev. Stat. § 301.100.3. Additionally, City Code § 44-387 provides that "[i]t shall be unlawful for any person to operate or park a motor vehicle

---

[11]In fact, the record shows that Watson was neither a resident of Missouri *nor* Florida at the time of the encounter; he resided in Illinois. *See* R. Doc. 187-2, at 28. Watson had not resided in Florida since 2005. *See id.* at 6. Under Illinois law, new residents have 90 days to obtain an Illinois driver's license, at which time their out-of-state license is no longer valid. 625 Ill. Comp. Stat. § 5/6-102(7). Thus, Watson's Florida driver's license would not have been valid at the time of the event.

on any roadway in this city unless there is an unexpired, valid state license plate . . . registered to that vehicle and displayed on such vehicle in accordance with state law." R. Doc. 187-4, at 5.

Missouri law also requires that the owner of every vehicle required to be registered in Missouri "shall submit such vehicles to a biennial inspection of their mechanism and equipment . . . and obtain a certificate of inspection and approval and a sticker." Mo. Rev. Stat. § 307.350.1; City Code § 44-406(b) likewise requires "[a]ll motor vehicles . . . [to] display current inspection stickers as required by state law." R. Doc. 187-4, at 9.

It is undisputed that, at the time he was stopped, Watson was driving a car in Missouri that had a Florida license plate. Watson told Officer Boyd that his name was "Fred Watson" instead of "Freddie Watson" and provided a Florida address. Officer Boyd was unable to locate "Fred Watson" in REJIS. After searching the vehicle and learning Watson's legal name, Officer Boyd again searched REJIS and learned that Watson had an expired Missouri driver's license that he had never surrendered. *See* R. Doc. 187-1, at 31. Watson's "resident address" was listed as "St[.] Louis, MO." *Id.* at 37 (all caps omitted). This search also showed a "current address" for Watson in "Fairview Hts[.], IL." *Id.* (all caps omitted). Finally, a subsequent REJIS search indicated that Watson's vehicle was registered and insured in Florida. *See id.* at 38. "It is undisputed that Watson's vehicle . . . did not have an inspection sticker." *Watson*, 2022 WL 16569365, at *2.

Given this conflicting information—Watson's resident address of St. Louis, Missouri, with an expired, non-surrendered Missouri driver's license; his current address of Fairview Heights, Illinois; and his vehicle registration in Florida—Officer Boyd had at least arguable probable cause to believe that Watson was a Missouri resident who failed to properly register his vehicle, in violation of Mo. Rev. Stat. § 301.100.1 and City Code § 44-387. For the same reasons, Officer Boyd had at least

arguable probable cause to cite Watson for failing to have an inspection sticker, in violation of Mo. Rev. Stat. 307.350.1 and City Code § 44-406.

c. *Failure to Obey*

It is undisputed that Officer Boyd instructed Watson to "throw the keys out of the car," R. Doc. 187-2, at 18, and "exit the vehicle," R. Doc. 194, at 8, but Watson failed to do so. Section 29-16 of the City Code makes it unlawful for any person "to *willfully and knowingly* obstruct, resist, oppose or fail to obey a lawful command of any police officer or city official charged with enforcement of this Code." R. Doc. 187-4, at 3 (emphasis added).

On appeal, Watson argues that a fact question remains as to whether he "willfully and knowingly" disobeyed Officer Boyd. He asserts that the reason he failed to comply with Officer Body's commands is because Officer "Boyd had *just* ordered him to keep his hands on the steering wheel *under the threat of being shot*, and therefore his orders were conflicting and . . . Watson was complying with the earlier order out of fear for his life." Appellant's Br. at 38–39.

As the district court explained, Watson's subjective state of mind is irrelevant to the arguable probable cause analysis. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) ("[The officer] provided two warnings before executing the takedown procedure. Even accepting [the plaintiff's] account that he did not hear [the officer's] instructions, an arrestee's subjective motive does not bear on how reasonable officers would have interpreted his behavior."). Watson admittedly did not obey Officer Boyd's commands. Thus, Officer Boyd had at least arguable probable cause to issue the citation for failure to obey.[12]

---

[12] Watson alternatively argues that even if arguable probable cause exists for his arrest for failure to obey, "the 'narrow' exception to the probable cause requirement [applies]: 'where officers have probable cause to make arrests, but

d. *False Statement*

Watson argues that Officer Boyd lacked arguable probable cause to charge him with making a false statement. Specifically, he argues that (1) the district court failed to recognize that he was charged with "false reports" instead of "false statements," (2) no reasonable officer would have believed that Watson was making a false statement by identifying himself as "Fred Watson" instead of "Freddie Watson," and (3) he did not knowingly make a false statement.

We first address Watson's contention that a fact dispute remains over whether he was charged with making a false statement or a false report. The record shows that on the date of Watson's arrest—August 1, 2012—Officer Boyd submitted an "Offense/Incident Report." R. Doc. 194-3, at 1. It lists the "Type of Incident" as "Failure to obey, obstructing, resisting, etc. [a] city official." *Id.* (all caps omitted). The report states, in relevant part:

> [Watson] refused to exit the vehicle and after the 5th time of instructing him to exit the vehicle he was advised he was under arrest for "Fail[ure] to Obey an Officer" and that if he didn't exit the vehicle he would be

_____

typically exercise their discretion not to do so.'" Appellant's Br. at 40 (quoting *Nieves*, 587 U.S. at 406). Under the *Nieves* exception, "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez v. Trevino*, 144 S. Ct. 1663, 1665–66 (2024) (per curiam) (quoting *Nieves*, 587 U.S. at 407). Here, Watson has produced no such objective evidence. *Cf. id.* at 1667 (holding former city council member's survey of past decade's misdemeanor and felony data for the county in which city was located, which purportedly showed that Texas's anti-tampering statute had never been used in the county to criminally charge someone for trying to steal a nonbinding or expressive document, was a permissible type of objective evidence for the council member to produce to show that the existence of probable cause to arrest did not defeat her First Amendment retaliation claim).

tased. He raised his window up and moments later reluctantly exited the vehicle where he was taken into custody and all resisting ceased. After placing him into handcuffs he kicked his driver's door closed in an attempt to lock it as if he were trying to conceal something. The door did not lock and a *search incident to arrest revealed his real name was: Freddie Watson . . . .*

*Watson was additional[ly] charged with making a ["]False Statement[."]* It should be noted a REJIS computer check of Freddy [sic] Watson revealed no record of an operator's license through Florida, Illinois, or Missouri.

A REJIS check of Freddie Watson revealed an ["]Expired Operators License["] through Missouri that had not been surrendered to another state.

*Id.* at 2–3 (emphases added) (spacing altered).

Like the report, the complaint for the false statement charge is dated "8/1/12" in the upper right-hand corner. R. Doc. 196-13, at 2. In the complaint, Officer Boyd wrote: "False Statement—Watson gave a false name after advising he did not have his identification on him. He later said his military ID was in the vehicle he tried to secure before being taken into custody." *Id.* And the bond form dated "8-2-12" that Watson admitted receiving when he was released lists all nine of the citations, including the false statement charge. R. Doc. 205-2, at 21.[13]

---

[13]Contrary to the record, Watson argues that Officer "Boyd did not *charge* [him] with false statements until . . . *a day after [his] arrest*," Appellant's Br. at 43 (first emphasis added). In actuality, Watson did not *learn of* the charges of making a false statement and failure to comply until later. *See* R. Doc. 196-3, at 58 ("Well, I wasn't given [the] tickets [for making a false statement and failure to comply] up front and when I went to complain I found out about them later when I got a lawyer and that's again when I first found out about those two tickets." (emphasis added)).

A "Municipal Division Filing Memorandum" dated July 5, 2013, likewise states that Watson was charged with "False Declaration" in violation of City Code § 29-16. R. Doc. 205-8, at 11 (all caps omitted). Stephanie Karr, the City's prosecuting attorney, testified that "false statement" and "false declaration" are interchangeable. R. Doc. 205-8, at 4 ("It's sometimes referred to as false declaration or something.")

The Ferguson Municipal Court's criminal case docket, printed on May 31, 2016, is the only record that shows Watson was charged with "False Reports," in violation of City Code § 29.21. R. Doc. 197-14, at 2 (all caps omitted). Watson faults the district court for not analyzing whether Officer Boyd would have had probable cause to issue a citation to him under this provision.

We discern no error. First, the record shows that *Officer Boyd* listed the charge as "false statement" in both his report and the complaint. Watson has produced no evidence that *Officer Boyd* had control over the listing of the charges on the criminal case docket. Second, the relevant documents are the *charging* documents. In her deposition, Karr confirmed that Watson was "charged" with "false declaration." *See* R. Doc. 205-8, at 4. As a result, there is no genuine dispute of material fact as to whether *Officer Boyd* arrested Watson for, *inter alia*, making a "false statement."

Next, we consider whether a reasonable officer would have believed that Watson was making a false statement by identifying himself as "Fred Watson" instead of "Freddie Watson." Consistent with Officer Boyd's report and complaint listing the offense as "false statement," the Municipal Division Filing Memorandum lists the offense as "False Declaration" in violation of City Code § 29-16. R. Doc. 205-8, at 11. As previously discussed, City Code § 29-16 makes it unlawful for any person "to willfully and knowingly obstruct, resist, oppose or fail to obey a lawful command of

-23-

any police officer or city official charged with enforcement of this Code." R. Doc. 187-4, at 3.

There is no dispute that Officer Boyd asked for Watson's name and address and that, in response, Watson told Officer Boyd that his name was "Fred Watson"—as opposed to "Freddie Watson"—and gave him a Florida address. Watson did not provide Officer Boyd with an alternative name. Watson was unable to locate "Fred Watson" in REJIS. Only after conducting the vehicle search and finding Watson's documentation did Officer Boyd learn that Watson's legal name was "Freddie Watson," not "Fred Watson." Thereafter, Officer Boyd conducted another REJIS search with this name and was able to retrieve Watson's information. That search showed that "Freddie Watson" did not have a Florida address but instead had a "resident address" in "St[.] Louis, MO," and a "current address" in "Fairview Hts[.], IL." R. Doc. 187-1, at 37 (all caps omitted). Based on this conflicting information, Officer Boyd had arguable probable cause to believe that Watson did not obey his command to provide him with his name and address but instead attempted to mislead Officer Boyd by providing his non-legal name and address that was not his resident address or current address.

Finally, we can easily dispense of Watson's argument that a fact dispute remains over whether he *knowingly* made a false statement when he provided Officer Watson with his commonly used name of "Fred Watson" instead of his legal name of "Freddie Watson." As explained *supra*, Watson's subjective state of mind is irrelevant in analyzing arguable probable cause. *See Ehlers*, 846 F.3d at 1011.

### 2. *Retaliatory Use of Force*

Watson argues that the district court ignored his use-of-force retaliation claim and that he provided sufficient evidence to withstand summary judgment on this claim. The defendants respond that "[a]lthough the [d]istrict [c]ourt did not explicitly

address Watson's claim for retaliatory use of force, the [d]istrict [c]ourt correctly found in favor of Officer Boyd on Count II, and that decision should be affirmed." Appellees' Br. at ii.

Because the district court did not consider Watson's retaliatory use-of-force claim, we consider whether Watson produced sufficient evidence to withstand summary judgment on the claim.

> To establish a violation of the First Amendment based on the retaliatory use of force, a plaintiff must show that (1) []he engaged in protected activity, (2) the officer used force that would chill a person of ordinary firmness from continuing the protected activity, and (3) the use of force was motivated by the exercise of the protected activity.

*Welch v. Dempsey*, 51 F.4th 809, 811 (8th Cir. 2022).

"[C]riticizing a police officer and asking for his badge number is protected speech under the First Amendment" and therefore satisfies the first element of a retaliatory use-of-force claim. *Peterson*, 754 F.3d at 602. Here, Watson "asked [Officer Boyd for] his name and his badge number, [but] he refused." R. Doc. 187-2, at 15. The first element of a retaliatory use-of-force claim is satisfied.

The second element of a retaliatory use-of-force claim is "[t]he ordinary-firmness test." *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003). "The test is an objective one, not subjective." *Id.* at 729. It "is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Id.* at 728 (citing *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982)). "In applying this 'test,'" we remain "mindful" that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not

be great in order to be actionable." *Id.* at 729 (quoting *Bart*, 677 F.2d at 625). Construing the facts in the light most favorable to Watson, he has raised a genuine issue of material fact as to whether Officer Boyd's actions chilled Watson's speech. Under Watson's account of the events, Officer Boyd's action of pulling a gun on Watson and telling him that he could "shoot you right here" "[a]nd nobody will give a s\*\*t" easily satisfies the ordinary firmness test. *See, e.g.*, *Peterson*, 754 F.3d at 602 ("[The defendants] . . . do not deny that pepper spraying someone in the face would chill a person of ordinary firmness." (internal quotation marks omitted)); *Garcia*, 348 F.3d at 729 (holding that receiving several parking tickets totaling just $35.00 would chill a person of ordinary firmness); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (holding plaintiff stated a retaliation claim that would chill a person of ordinary firmness with allegations that officers stopped his car and detained him for an unreasonable time, "allegedly with their guns drawn during part of the traffic stop, and ultimately issued only a minor traffic citation that was later dismissed").

To satisfy the final element of a retaliatory use-of-force claim, Watson must produce evidence that Officer Boyd's use of force was motivated by Watson's exercise of his constitutional rights. *See Welch*, 51 F.4th at 811. Viewing the facts in the light most favorable to Watson, he has raised a genuine issue of material fact as to retaliatory motive. Watson testified that he asked Officer Boyd for his name and badge number, but Officer Boyd refused to provide the information. He described Officer Boyd as "visibly upset" in response to Watson's question. R. Doc. 187-2, at 29. After Watson removed his hands from his steering wheel to reach for his cell phone and Officer Boyd instructed him to put the phone down and place his hands back on the steering wheel, Watson complied. Crucially, according to Watson's testimony, it was *after* he had already complied with Officer Boyd's command that Officer Boyd "pulled his gun" and said, "I could shoot you right here" "[a]nd nobody will give a s\*\*t." *Id.* at 18. Based on these facts, a reasonable factfinder could conclude that retaliation was a but-for cause of Officer Boyd pulling his weapon on

Watson. *See Peterson*, 754 F.3d at 603 ("Moments before [the officer] used the pepper spray, [the plaintiff] had asked for [the officer's] badge number. Temporal proximity is relevant but not dispositive. Here, [the plaintiff] went beyond the timing of events, explaining that [the officer] engaged in a conversation with him about his badge number. [The officer] refused to give [the plaintiff] his badge number . . . ." (cleaned up)).

The defendants point out that "Watson [has] not challenge[d] the [d]istrict [c]ourt's ruling that Officer Boyd was entitled to qualified immunity on Watson's Fourth Amendment use of force claim, wherein the court found that the pulling of a gun for ten seconds on a non-compliant suspect did not constitute an unreasonable use of force." Appellees' Br. at 34. As a result, the defendants argue that Watson has failed to prove that the law was clearly established at the time of event "because this [c]ourt has never recognized a First Amendment right to be free from retaliatory use of force when that use of force is objectively reasonable under the circumstances." *Id.* at 37. They assert that a reasonable officer in Officer Boyd's position "could easily have concluded that just as having probable cause shields the officer from [a] First Amendment claim for retaliatory arrest or retaliatory charges, an objectively reasonable use of force shields the officer from a First Amendment retaliatory use of force claim." *Id.* at 38.

We have previously considered cases in which the plaintiff brought both a Fourth Amendment excessive force claim and a First Amendment retaliatory use-of-force claim. *See Dreith v. City of St. Louis*, 55 F.4th 1145, 1148 (8th Cir. 2022) ("[The plaintiff] filed suit in federal district court, claiming that [the officer] had violated her Fourth Amendment right to be free from excessive force and that he had pepper-sprayed her in retaliation for the exercise of her First Amendment rights."); *Peterson*, 754 F.3d at 596 ("[The plaintiff] asserts that [the officer] arrested him without probable cause, used excessive force, and did so in retaliation for engaging

in protected speech."). In *Dreith* and *Peterson*, the district court granted summary judgment to the officers on the Fourth Amendment excessive force claim. *See Dreith*, 55 F.4th at 1148 (affirming district court's grant of summary judgment on excessive force claim); *Peterson*, 754 F.3d at 60 (involving officer's interlocutory appeal of denial of qualified immunity on First Amendment retaliatory use-of-force claim wherein district court had also granted summary judgment to officer on Fourth Amendment excessive force claim). In both cases, we also held that the First Amendment retaliatory use-of-force claim survived summary judgment even when the Fourth Amendment excessive force claim did not.[14]

In this particular claim, Watson is "alleging retaliatory *use of force* in violation of the First Amendment." *Welch*, 51 F.4th at 812 (emphasis added). This type of claim is distinguishable from cases involving "a claim of retaliatory *arrest* under the First Amendment and an allegation of unreasonable seizure under the Fourth Amendment," which "concern seizures." *Id.* (first citing *Justice v. City of St. Louis*, 7 F.4th 761, 768–69 (8th Cir. 2021), then citing *Peterson*, 754 F.3d at 598). We acknowledge that "a First Amendment retaliatory *arrest* claim should not turn solely

---

[14]*See Dreith*, 55 F.4th at 1149 ("[The officer] contends that at the time he pepper-sprayed [the plaintiff], it was 'not clearly established that a use of force that does not violate the Fourth Amendment violates the First Amendment.' . . . [T]he argument does not undermine the district court's conclusion that [the plaintiff's] right to be free from a retaliatory use of force was clearly established at the time of the incident." (citation omitted)); *Peterson*, 754 F.3d at 602–03 ("We agree that [the officer] is entitled to qualified immunity on [the plaintiff's] retaliatory arrest claim because, as detailed above, [the officer] had at least arguable probable cause for the arrest. However, [the plaintiff] also claims that [the officer] pepper sprayed him in retaliation for criticizing [the officer] and asking for his badge number. . . . Taking the evidence in the light most favorable to [the plaintiff], as we must for this summary judgment analysis, [the plaintiff] has presented affirmative evidence that [the officer] pepper sprayed him in retaliation for criticizing him and asking for his badge number.").

-28-

on the personal motive of the arresting officer" because "subjective intent" is not relevant "[i]n the Fourth Amendment context." *Id.* at 812–13 (alteration in original) (quoting *Nieves*, 587 U.S. at 403). "But if there is an argument for extending the *Nieves* no-probable-cause requirement beyond a claim of retaliatory Fourth Amendment seizure, . . . then [the defendants] ha[ve] not presented it." *Id.* at 813.[15]

In summary, the district court erred in failing to address Watson's retaliatory use-of-force claim. Watson has presented sufficient evidence on this claim to withstand summary judgment.

## B. *Unreasonable Search and Seizure*

Watson argues that "the district court erroneously held that [Officer] Boyd's warrantless search of [his] car was lawful when the evidence showed that . . . Watson was arrested for traffic offenses, and Supreme Court precedent establishes that arrests for traffic offenses cannot justify warrantless vehicle searches." Appellant's Br. at 20.

Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (internal quotation marks omitted). "[A] search incident to a lawful arrest" is one of those "exceptions to the warrant requirement" and "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* "Police may search a vehicle incident to a recent occupant's arrest *only* if [(1)] the arrestee is within

_____

[15]The defendants note that we have declined to decide whether "arguable probable cause is an absolute defense to a First Amendment retaliation claim." *Molina v. City of St. Louis*, 59 F.4th 334, 354 (8th Cir. 2023). As Watson points out, "[t]hat is a distinct question from the one raised here." Appellant's Reply Br. at 6 n.4. We need only decide whether Watson's retaliatory use-of-force claim survives summary judgment.

reaching distance of the passenger compartment at the time of the search or [(2)] it is reasonable to believe the vehicle contains evidence from the offense of arrest." *Id.* at 351 (emphasis added).

It is undisputed that Watson was handcuffed in the back of the patrol car at the time of the search; therefore, we need only address whether Officer Boyd reasonably believed that the vehicle contained evidence from the offense of arrest. "Under the second *Gant* exception, officers may conduct a warrantless search of a vehicle incident to arrest—even after the arrestee is restrained in the back of a patrol vehicle—when officers have a reasonable basis to believe the vehicle contains evidence related to the crime of arrest." *United States v. Stegall*, 850 F.3d 981, 984 (8th Cir. 2017); *see also Riley v. California*, 573 U.S. 373, 385 (2014) ("*Gant* added . . . an independent exception for a warrantless search of a vehicle's passenger compartment when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." (internal quotation marks omitted)). "A permissible search incident to arrest may extend to the passenger compartment, including containers in the passenger compartment." *United States v. Campbell-Martin*, 17 F.4th 807, 815 (8th Cir. 2021).

"In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 556 U.S. at 343. In *Gant*, the Supreme "Court refused to apply the [search-incident-to-arrest] exception to the offense of driving with a suspended license." *Campbell-Martin*, 17 F.4th at 816 (citing *Gant*, 556 U.S. at 344).

> The *Gant* [C]ourt held that searching a car to find evidence of driving with a suspended license did not fall within the exception "[b]ecause police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein."

*Id.* (quoting *Gant*, 556 U.S. at 344); *see also United States v. Hambrick*, 630 F.3d 742, 747 (8th Cir. 2011) ("[L]ike the defendant in *Gant*, Hambrick was arrested for driving with a suspended license, and therefore the second prong of *Gant* would not allow the officers to search the vehicle for evidence of the offense of arrest.").

We distinguished *Gant* in *Campbell-Martin*. There, an officer requested the identification of a vehicle's occupants. *Campbell-Martin*, 17 F.4th at 812. The driver and front seat passenger provided their names but denied having any identification. *Id.* at 812. The officer ran the name of the front seat passenger and learned that it was a false name, so the officer arrested him "for providing false identification information." *Id.* Another officer arrived to assist and asked the back seat passenger to look for the driver's identification in a purse located in the back seat. *Id.* From that identification, the officer learned that the driver had given a false name and arrested her "for providing false identification information." *Id.* The police performed a search incident to arrest "and found a backpack on the floor of the front-seat passenger area" containing drugs, cash, and paperwork addressed to the defendants. *Id.* After conditionally pleading guilty, the defendants appealed the denial of their suppression motion challenging the search. *Id.* at 812–13. On appeal, they challenged, among other things, the legality of the police's warrantless search of the backpack. *Id.* at 815. They "d[id] not challenge the basis for or the legality of their arrest." *Id.* at 816 n.2.

The case was distinguishable from *Gant* based on "the offense of arrest—the offense of providing false identification information." *Id.* at 816. We held that "it was reasonable to believe that the vehicle and the backpack contained evidence of the offense of providing false identification information." *Id.* While the officers already knew that the defendants provided false identification prior to the search, we noted that the officers lacked the front seat passenger's "actual identification, which would help prove that [he] provided false identification." *Id.*; *see also id.* ("'[I]t [was]

-31-

reasonable to believe the vehicle contain[ed] evidence of the offense of arrest' because police could have found evidence in the car and in the backpack relevant to the occupants providing false identification information, even though the officer already knew their real names." (second and third alterations in original) (quoting *Gant*, 556 U.S. at 351)). We determined that "[i]t was reasonable to think that his identification would be in the car because he had not given the officers any identification even after he was arrested." *Id.* The backpack was positioned at the front seat passenger's feet; thus, it "was a logical place to look for identification such as a driver's license, mail, receipts, credit cards, or checks." *Id.* We found "[n]othing in *Gant* prohibit[ing] the police from searching for additional evidence of an offense." *Id.* (citing *Gant*, 556 U.S. at 343–44). "Considering the totality of the circumstances, we conclude[d] that the officers were permitted to search the car and the backpack as a search incident to arrest." *Id.* at 817.

Watson attempts to distinguish *Campbell-Martin* from his case on two bases. First, he asserts that "it is clear what crime justified the search in *Campbell-Martin*." Appellant's Br. at 47. By contrast, a genuine issue of material fact exists in this case as to which offense of arrest justified Officer Boyd's search of his vehicle. *See United States v. Webster*, 625 F.3d 439, 445 (8th Cir. 2010) ("[T]he record evinces a dispute regarding the nature of Webster's arrest, which impacts whether the officers had reason to believe the vehicle contained evidence of the *offense of arrest*." (internal quotation marks omitted)).

The district court "held that Officer Boyd had probable cause or arguable probable cause to arrest Watson for, *inter alia*, the following offenses: no operator's license in possession, no proof of insurance, and providing false declarations (for identifying himself as 'Fred Watson' rather than 'Freddie Watson' and providing a false Florida address)." *Watson*, 2022 WL 16569365, at *12. Watson argues that "no reasonable officer would believe [his] vehicle contained evidence related to the first

-32-

two offenses, and therefore those could not be the bases for the search." Appellant's Br. at 43. He further argues that "if the third offense was the basis for the search, then that necessarily fails too because [Officer] Boyd did not charge [him] with false statements until *after* [he] had attempted to lodge a complaint against [Officer] Boyd *a day after [his] arrest.*" *Id.*

We will examine the record to determine whether the district court correctly concluded that Officer Boyd conducted the search incident to arrest based on, *inter alia*, Watson making a false statement. As explained *supra*, Officer Boyd's report—dated on the arrest date—provides that Watson was also charged with making a false statement. *See* R. Doc. 194-3 at 2–3. The complaint for the false statement charge—also dated on the arrest date—charges Watson with making a false statement; specifically, Watson giving Officer Boyd a "false name" after stating he did not have his identification. Based on the record, there is no genuine dispute of material fact as to the offenses for which Watson was arrested. All the contemporaneous documents from the day of the incident list nine charges, including the false-statement charge.[16]

---

[16]Watson also argues that Officer Boyd was not searching the vehicle for the purpose of finding evidence to support the false-statement charge. But Officer Boyd's subjective state is irrelevant in evaluating whether the search-incident-to-arrest exception applies. *Cf. Bond v. United States*, 529 U.S. 334, 338, n.2 (2000) ("The parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment. . . . [T]he issue is not his state of mind, but the objective effect of his actions."); *Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001) (per curiam) (holding that a custodial arrest for a traffic violation and search incident to arrest do not violate the Fourth Amendment just because an officer had a subjective pretextual motivation for making the stop).

Second, Watson argues that *Campbell-Martin* is distinguishable because "it is clear *why* in *Campbell-Martin* the crime of false identification would justify a search incident to arrest"—"the officer had probable cause to believe that the suspects were lying about not having identification as they were trying to be purposefully evasive." Appellant's Br. at 47. By contrast, Watson maintains that he provided his "real name" to Officer Boyd and that Officer "Boyd found Mr. Watson in the REJIS database based on that name, with the only deviation being that Mr. Watson was listed as Freddie and not Fred." *Id.* (citations omitted).

There is no dispute that Watson told Officer Boyd that his name was "Fred Watson"—as opposed to "Freddie Watson"—prior to the search. Watson could not locate "Fred Watson" in REJIS. Officer Boyd then conducted the search, located Watson's documentation, and learned that his legal name was "Freddie Watson," not "Fred Watson." Thereafter, Officer Boyd conducted another REJIS search with this name and was able to retrieve Watson's information. Even if Officer Boyd had already determined from the first REJIS search that Watson provided him with a false name because it did not appear in REJIS, he still lacked Watson's "actual identification, which would help prove that [Watson gave a false name]." *Campbell-Martin*, 17 F.4th at 816.

Accordingly, we affirm the district court's dismissal of Watson's unreasonable search claim.

## C. Monell *Claim*

The district court granted summary judgment to the City on Watson's *Monell* claim based on its conclusion that Officer Boyd did not violate any of Watson's constitutional rights. But we have determined that a genuine issue of material fact exists as to whether Officer Boyd used force against Watson for exercising his First

Amendment right to request Officer Boyd's name and badge number. *See supra* Part II.A.2.

The defendants nonetheless assert that "*even if* Officer Boyd's actions did violate Watson's constitutional rights, Officer Boyd is still entitled to qualified immunity because those claimed rights were not 'clearly established.'" Appellee's Br. at 46. "As a result," the City argues, it "is entitled to summary judgment on its *Monell* claims because where a right is not clearly established, Watson cannot show the City's fault rose to the level of deliberate indifference." *Id.* at 46–47.

We disagree. It was clearly established at the time of the event that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up). As a result, we reverse the grant of summary judgment on Watson's *Monell* claim.

### III. *Conclusion*

Accordingly, we affirm the district court's grant of summary judgment on all claims except Watson's First Amendment retaliatory use-of-force claim and remand for further proceedings on that claim.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from Part II.A.2, which denies qualified immunity to Officer Eddie Boyd on Fred Watson's use-of-force retaliation claim, as well as Part II.C, which denies summary judgment to the City of Ferguson ("City") on Watson's *Monell* claim. I would affirm the district court's judgment in its entirety.

Officer Boyd is entitled to qualified immunity, unless Watson shows that a genuine dispute of material fact exists on whether (1) he engaged in protected activity, (2) Officer Boyd took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) that there was a but-for causal connection between his injury and Officer Boyd's alleged retaliatory animus. *See Nieters v. Holtan*, 83 F.4th 1099, 1110 (8th Cir. 2023). If there exists an "obvious alternative explanation" for Officer Boyd's use of force, causation is missing. *Auer v. City of Minot*, 896 F.3d 854, 861 (8th Cir. 2018); *Laney v. City of St. Louis*, 56 F.4th 1153, 1158 (8th Cir. 2023). I agree with the court's analysis on (1) and (2). However, as to (3), the court believes that Officer Boyd is not entitled to qualified immunity because a reasonable factfinder could conclude that there exists a but-for causal connection between Watson's request for Officer Boyd's name and badge number and Officer Boyd's pointing of his firearm at Watson. *Ante*, at 26-27. In my view, there is no genuine dispute of material fact on the issue of causation.

Causation is missing because there exists an "obvious alternative explanation" for Officer Boyd's use of force. *Auer*, 896 F.3d at 861. Watson testified that his hands were placed on his car's steering wheel when he asked for Officer Boyd's name and badge number. After Officer Boyd refused to provide Watson with this information, Watson removed his hands from the steering wheel and grabbed his phone, which was on the "console above the radio." According to Watson, Officer Boyd began "yelling and screaming [for Watson to] put the phone down" "because of police safety." Officer Boyd then called for backup and pointed his firearm at Watson. Thus, the "obvious alternative explanation" for Officer Boyd's use of force was the intervening act where Watson reached for his phone.

The court glosses over the existence of this intervening act, concluding that a genuine dispute of material fact exists because Watson had already returned his hands to the steering wheel by the time Officer Boyd pointed his firearm at him. *Ante*, at 26.

However, this single act by Watson does not negate the rapid sequence of events that occurred prior to it. Watson admitted that Officer Boyd did not point his firearm at him immediately after he asked for Officer Boyd's name and badge number. It was only subsequent to that—after Officer Boyd observed Watson's aggressive hand motion for his phone—that Officer Boyd called for backup and pointed his firearm at Watson. The court does not properly consider this entire sequence of events and therefore takes a narrow view of the entire encounter. In doing so, the court holds Officer Boyd to a higher standard than is required to obtain qualified immunity. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

The court also suggests that the temporal proximity between Watson's request for Officer Boyd's name and badge number and Officer Boyd's subsequent display of force creates a genuine dispute of material fact on causation. *Ante*, at 26-27. As an initial matter, temporal proximity, without more, does not allow for an inference of a retaliatory motive. *See Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) ("Temporal proximity is relevant but not dispositive."). But, even more importantly, the court focuses on the temporal proximity between Watson's request and Officer Boyd's subsequent display of force while simultaneously ignoring that Watson's act of reaching for his phone occurred even closer in time to that display of force. The entire sequence of events dispositively shows that Officer Boyd pointed his firearm at Watson due to Watson having reached for his phone. A reasonable factfinder could not conclude otherwise.

Officer Boyd was required to make a "split-second judgment[]" in a "tense, uncertain, and rapidly evolving" circumstance. *Shelton v. Stevens*, 964 F.3d 747, 752 (8th Cir. 2020). Because Officer Boyd's use of force was justified by the existence of the intervening act (Watson reaching for his phone), Officer Boyd is entitled to

qualified immunity on Watson's use-of-force retaliation claim. Accordingly, there is also no basis to hold the City liable on *Monell*. *See Edwards v. City of Florissant*, 58 F.4th 372, 376 (8th Cir. 2023) ("Absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City."). For these reasons, I respectfully dissent as to Parts II.A.2 and II.C of the court's opinion.

_____